**Robert BURKE, Plaintiff,**

v.

**CITY OF CHARLESTON, Defendant.**

Civ. A. No. 2:93–3001–22.

United States District Court,
D. South Carolina,
Charleston Division.

June 23, 1995.

Gregory S. Forman, William J. Hamilton, III, Charleston, SC, for plaintiff.

John Hamilton Smith, William B. Regan, Charleston, SC, for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

CURRIE, District Judge.

This unusual case examines the constitutionality of a content-neutral place and manner regulation affecting pure speech in a historic preservation district.[1] In this civil

1. The parties dispute whether the regulation is content-based or content-neutral, and whether the speech is pure or commercial speech. However, based on the evidence at trial and the

rights action brought pursuant to 42 U.S.C. § 1983 Plaintiff, an artist, challenges historic preservation ordinances enacted by Defendant City of Charleston (hereinafter "the City"). Jurisdiction is based on federal question, pursuant to 28 U.S.C. § 1331.

Plaintiff's Complaint alleges that the City wrongfully denied a permit for the display of a large mural painted by Plaintiff on the exterior wall of a restaurant located in the Old and Historic District of Charleston at 348 King Street. Although the mural was located on private property, it was publicly visible from the street. Plaintiff mounts a facial challenge to the ordinances, claiming they are vague and overbroad. In addition, Plaintiff claims the City's application of the ordinances to his mural abridged his First Amendment right to free speech, as well as his rights to due process and equal protection, as guaranteed by the First and Fourteenth Amendments to the United States Constitution. Plaintiff seeks injunctive relief restraining the City from enforcing the ordinances, compensatory damages, and attorneys' fees. The City admits that the Board of Architectural Review (hereinafter "the BAR"), an administrative agency of the City, denied a permit for the display of Plaintiff's work, but denies that its actions were wrongful.[2]

The matter came on for nonjury trial March 22, 1995, through March 24, 1995. Following the presentation of evidence the court conducted its view of thirteen sites specified by counsel for the parties. The court's view spanned several hours, and included an extensive walk through the King Street area.

Pursuant to Rule 52(a), Fed.R.Civ.P., the court makes the following Findings of Fact and Conclusions of Law. To the extent that any Findings of Fact constitute Conclusions of Law, or vice-versa, they are to be so regarded.

## FINDINGS OF FACT

1. In July 1993, Ron Klenk, the owner of the premises located at 348 King Street, decided to open a bar and grill, to be known as the "Treehouse Grill," on the first floor of the building. The building already housed a nightclub, known as the "Treehouse Night Club," on the second floor. The upstairs nightclub displayed several paintings by Plaintiff on its interior walls.

2. The premises known as 348 King Street are located within the Old and Historic District of the City of Charleston. The Old and Historic District comprises 2.7 square miles or 4% of the City and contains 2800 historically significant buildings, the largest collection in the United States. *See* testimony of Charles Chase, Preservation Officer. The Old and Historic District is the heart of the tourist attraction to Charleston.

3. The immediate area around 348 King Street is a commercial area which draws a large number of college students, and is conveniently located to the University of Charleston. Young persons live in apartments on the second and third floors of buildings along that block. The block contains numerous bars, shops, bookstores and fast food restaurants. The block is aesthetically diverse, and has significant tourist traffic. Several of the buildings in the block of 348 King Street are dilapidated, and a few, such as the subject site, are vacant.

4. As is clearly illustrated by Plaintiff's Exhibits 19–21, the building at 348 King Street contains a fully recessed storefront that abuts, but does not include, the public sidewalk. The recessed area, which is private storefront, is of roughly triangular shape and was last renovated in the 1970s. Plate glass windows look out on the recessed area, and adjacent to the entrance there is a

---

court's review of the applicable law, the court finds the regulation to be content-neutral, and the speech to be pure speech, as detailed below in the Conclusions of Law.

**2.** The City initially asserted as an affirmative defense that Plaintiff lacked standing to pursue this claim. The City, however, never pursued its affirmative defense. At a Bar Meeting held Octo-

ber 17, 1994, the court instructed counsel for the City to file a Motion to Dismiss if that defense was to be pursued. At trial counsel for the City advised that the City had abandoned that defense. The court has, nevertheless, addressed the standing issue in Conclusion of Law number 2 below.

flat masonry wall about nine by fifteen feet in length. This wall, clearly visible from the street, is the wall upon which Plaintiff painted the mural in 1993.

5. Plaintiff is a painter with a style that generally can be described as pop art. His work is influenced by pop and folk art, and surrealism. His work has a cartoon quality with bold lines, and graphic, arresting displays. Plaintiff received an Associate Degree from the Art Institute in Fort Lauderdale, Florida. After working in a band and for Greenpeace, Plaintiff decided to move to Charleston in November 1990. After struggling to establish himself in the artistic community, and taking lessons from local artists, Plaintiff, by 1993, had attracted modest local recognition. Three to four months before Plaintiff painted the mural at issue in this case, he had done a painting of similar style, about 3' × 4', which had sold for $500. Plaintiff also sells traditional Charleston watercolors at a booth located in Artisans Alley in the market area of the Old and Historic District.

6. In July 1993 Klenk engaged Plaintiff to paint a mural on the flat masonry wall at 348 King Street. Plaintiff had painted one mural earlier on a restaurant door. Klenk gave no directions to Plaintiff as to the mural desired. Klenk, however, did specify that a small blank space was to be left in the middle of the mural for a sign advertising the Treehouse Grill. Plaintiff substantially finished the mural, which was 8' × 15', in three days. He painted in a "stream of consciousness" method without a plan. Plaintiff attempted to incorporate into the work the influences of that area of King Street at that time. For example, Plaintiff testified the mural reflects the influence of young persons dancing and enjoying a party atmosphere on King Street while the mural was being painted.

7. Plaintiff has painted approximately 16–20 works similar to the subject mural. Many of these were displayed at trial, *see* Plaintiff's Exh. 28. In these works Plaintiff has created a world of new creatures, about 28 in number in the first generation. Plaintiff seeks to illustrate a happy universe where diverse creatures coexist peacefully. The subject mural, depicted in Plaintiff's Exhibit 5, bears this style and was described in Plaintiff's Complaint as "a colorful cartoon of imaginary characters, including smiling mountains, flying creatures with impractically small wings and tiny yellow bipeds." Plaintiff testified that he needs a multitude of colors in order to paint in this style, although he can adjust to size limitations.

8. Plaintiff's work carries some artistic message emphasizing the importance of diversity and tolerance in society. This message may, however, not be readily discernible by all persons.

9. Klenk paid Plaintiff $500 to paint the mural. Plaintiff hoped the mural would be displayed for an indefinite period of time along the heavily traveled King Street. Plaintiff wished to expose his work to a broader audience than his prior paintings, prints and T-shirt designs had drawn. He thus agreed to execute the mural for the sum of $500, which was less than the cost of one of his smaller paintings in similar style. The cost of renting comparably sized gallery space in the Old and Historic District was approximately $1,000 per month.

10. The size of the space reserved for the Treehouse Grill sign in the middle of the mural was quite small in proportion to the entire expanse of the mural, and probably did not approach $\frac{1}{25}$th the size of the mural.

11. As a result of Plaintiff's execution of the mural at 348 King Street, and the subsequent public controversy and extensive media attention surrounding the mural's display, Plaintiff secured a commission to create two murals at a McDonalds restaurant on Savannah Highway, outside the Old and Historic District. The murals contain many of the same creatures and colors contained in the mural at 348 King Street. Plaintiff was paid $11,600 for the work.

12. Another restaurant owner approached Plaintiff about painting a mural on King Street. The Horse & Cart Restaurant is located at 347 King Street. It is therefore subject to the same ordinances that precluded display of Plaintiff's mural at 348 King Street. Plaintiff testified he has therefore been prevented from painting another mural in that style at a similar location.

13. The mural combined pure speech and commercial speech. It can be considered a sign that contained artwork. It had no obscene content, nor was it false or misleading.

14. Two prior murals had been painted on the same wall upon which Plaintiff painted his mural. The first mural, "The Willow Tree" mural, promoted a vegetarian restaurant. It is depicted in a photograph included in Defendant's Exhibit 1, the BAR file on 348 King Street. The Willow Tree mural was a pastel mural on a white background, and occupied approximately one third of the wall expanse. The Willow Tree mural remained for several months, and although application was made to the BAR for a permit, the closing of the restaurant mooted the application on March 11, 1992.

15. The second mural was a Cajun-style mural, which is also depicted in Defendant's Exhibit 1, on the back of the Sign Permit Application filed May 24, 1993, for Tee Pauly's Restaurant. Although application for permit was made for this mural, it was disapproved by the BAR on June 28, 1993, "because it exceeds the size allowed on the facade." The mural had been in place for several months prior to the time the BAR ordered it painted over. The Tee Pauly's mural that was rejected by the BAR was a scene of a Cajun restaurant on stilts in a swamp, and included some bright colors and fluorescent paint.

16. The BAR was established in 1931 by ordinance 54–26 of the City of Charleston for the purpose of reviewing proposed alterations to exteriors of structures within historic areas of the City in order to maintain harmony as to style, form, color, proportion, texture and material of buildings in the historic area. When first established in 1931 its jurisdiction governed that area around Church and South of Broad Streets, but its jurisdiction has been steadily expanded to include a larger part of the peninsula of Charleston as additional historical structures have been identified. The BAR's operations are conducted on a day-to-day basis by a full-time professional staff. The BAR's operations are governed by ordinances 54–23 through 54–35, Defendant's Exhibit 3. Within the Old and Historic District no exterior or fixed structural alterations, signs, murals or other exterior changes can be made without approval of the BAR. BAR jurisdiction does not, however, extend to what hangs in windows of shops. Therefore, nothing would prevent the hanging of Plaintiff's artwork in the window of any premises in the Old and Historic District.

17. Some building modifications subject to BAR review have been approved after changes were carried out. However, the general procedure is that an applicant must submit an application for permit to the BAR along with a proposal describing the work.

18. Neither Plaintiff, nor the property owner, Ron Klenk, submitted an application to the BAR for approval of the mural at 348 King Street prior to painting the mural. Nor had they attempted to solicit by pre-application the opinion of the BAR as to the appropriateness of Plaintiff's mural at that location. Thus, the work was commenced, and executed substantially to completion, without prior approval of the BAR, as required by ordinances 54–29 and 54–30.

19. When the mural was discovered by BAR representatives, a stop work order was issued and Ron Klenk filed an application for approval, see Defendant's Exhibit 1, application filed August 9, 1993. The parties agreed to cover the mural with a temporary plywood wall pending adjudication of the BAR application. Subsequently, the parties extended the agreement to cover the litigation period. Thus, the mural remains covered with plywood.

20. Plaintiff retained an attorney to handle his BAR application. A public hearing was held October 13, 1993, at which Plaintiff, his counsel, and several other persons spoke. At that hearing Plaintiff's counsel submitted several exhibits containing letters supporting the mural, and photographs of other murals in Charleston. See Transcript of October 13, 1993, hearing, Defendant's Exhibit 2. Several persons, including the Chairman of the Historic Charleston Foundation, spoke against the mural on the ground that it was inappropriate because it was larger than other permitted signage. See id. 25. Another member of the Preservation Society of

Charleston also spoke against the mural, stating that it was inappropriate to the historic district. *Id.* at 28. All persons were given an opportunity to be heard, and Plaintiff had an opportunity to call witnesses and cross-examine opposing witnesses. Following the hearing, the BAR deliberated. Its members considered Plaintiff's mural in the context of commercial signage, and emphasized their opinion that they were not rendering subjective interpretations of Plaintiff's artistic message or expression. Several members stated that there was nothing wrong with the mural as art, but they felt it was inappropriate to Charleston, or inappropriate compared with signage elsewhere on King Street. One member commented, "A Picasso Mural on the wall would not be appropriate." Defendant's Exhibit 2 at 36. Another member stated his belief that the mural was not compatible with the architecture of the building at 348 King Street. However, one member felt the mural was appropriate to the area although he emphasized that each application must be decided on its own merits within the context of its own location.

21. Prior to the October 13, 1993, hearing, the BAR also had received several letters from Charleston-area residents about the mural, which were read into the record at the hearing. The letters expressed a wide body of differing opinion, ranging from statements against the mural, *e.g.*, "I hope that the council will use its good taste, of which Charleston is famous for, and refuse to grant a permit to that ugly, controversial mural on King Street that is sophomoric and offensive. A child could have done a more pleasant and artistic mural than this one. Please do not ruin our beautiful downtown by allowing this tasteless work to stay," to the following statement in favor of the mural by a well-known nationally syndicated columnist who resides in Charleston:

The mural is a charming work in every way. It is not obscene, not suggestive, not offensive to anyone save a few sulking dunderheads with no sense of humor. It does not front on King Street. It is in a door-alcove off the street. In a crummy, commercial, non-historic part of town, it provides a touch of color and of fey amusement. I entreat you: Not *everything* in Charleston must be hung in Spanish moss. The city must occasionally unstuff its shirt and have a little fun.

22. The voting members of the BAR voted not to approve the mural. The BAR Report, dated October 13, 1993, stated its reasons for denial of the permit as follow:

(Mural) Inappropriate in size, scale, inappropriate for location in historic district; garish colors; not in concert with surroundings; ref. Ordinance section 54-31.

23. Although the BAR denied the mural application, it did approve a sign on a pole on the sidewalk in front of 348 King Street which contains the same colorful characters depicted in the mural. In fact, the sign is an extract from the larger mural, and contains the profile of a bright yellow creature devouring a smaller creature resembling a lizard, on a bright green background. *See* Plaintiff's Exhibit 3. The sign is of a standard size utilized by businesses along King Street. The sign is in the same style as the mural, and is being displayed within several feet of the mural wall. It is depicted in Plaintiff's Exhibits 19–21.

24. The facade of 348 King Street is depicted in Plaintiff's Exhibit 20 and several pictures contained in the BAR file, Defendant's Exhibit 1. It is a three-and-one half story brick building, circa 1830, which has been altered at the first floor level only. It is a late Federal style building, with Charleston chimneys. The building is constructed of Charleston "gray" brick, with white mortar thinly laid and beaded. A cornice of molded brick extends around the building. It has a slate-covered hip roof, with dormers. The renovated first floor storefront has neoclassic pilasters on both sides. There is a glass storefront, recessed on the diagonal, with flagstone paving in front.[3]

---

3. These factual findings are based on the testimony of Robert Stockton, an expert architectural historian, and certain reports contained in Defendant's Exhibit 1, which were not objected to by Plaintiff, and which the court finds have guarantees of trustworthiness, pursuant to F.R.Evid. 803(24).

25. The sidewalk in front of the mural wall is private property, although it abuts the public sidewalk. Plaintiff introduced no evidence at trial that the wall upon which Plaintiff painted his mural had, by tradition, custom or usage, been dedicated to public expression or had in any fashion become a public forum.

26. A collection of historic photographs and postcards of the relevant King Street area were introduced by Plaintiff, *see* Plaintiff's Exhibit 1. They reflect that King Street has operated primarily as a commercial district.

27. Architectural historian Stockton testified that the structure at 348 King Street was built by a French woman, Margaret Gidiere, in the 1830's, and was originally a commercial dry goods store on the first level, and a residential structure above. In 1856 the property was purchased by John Schachte, who opened a tavern at the location and lived above it. In 1877, the property was again sold, and another saloon was opened at the location. In 1898, the property was sold and a commercial business selling "paints, oils, leathers, and findings" was conducted there, with the family living upstairs. In 1909, the property owner converted its use to a motion picture and vaudeville house, known as the Lyric Theatre, which operated until 1928. Thereafter, the building was used for commercial purposes only. The King Street area suffered a decline in the early part of the 20th century. However, in 1961, the building was used as an office-shop complex. In 1977 the building underwent substantial first floor renovations in which the first floor storefront was recessed, as part of the King Street Facade Program, a federally funded grant program, *see* Defendant's Exhibit 7. During that renovation, an interior wall was exposed and became the exterior surface upon which Plaintiff painted the mural. The purpose of the Facade Program was to give owners a better concept of how to keep their first floors in conformity with the historic ambiance of the area. From 1977 until it burned in 1980, a restaurant and discotheque, Momma's Money, operated there. In the last 15 years a series of bars and restaurants have operated at the location. In July 1993 Ron Klenk sought to open the Treehouse Grill there. *See* Testimony of Robert P. Stockton.

28. There is longstanding historical precedent in Charleston for the painting of murals on exterior walls of commercial buildings, although there are fewer murals today than around the turn of the century. The most famous mural, located at Broad and Church Streets on a law office building and known as "The Hat Man," is depicted in Plaintiff's Exhibit 22. It is a pastel-shaded fanciful cartoon mural of an individual constructed entirely of hats. It is an 8' × 10' mural. Although its date of creation is uncertain, the Mayor testified that it had been in existence at least 52 years. In 1990, painter Helen Thomas restored "The Hatman" by repainting it according to historic detail. The restoration was approved by the BAR.

29. The BAR has jurisdiction over modifications to all buildings in the Old and Historic District. In addition, it also regulates buildings in the Old City District, a larger area, that are over 75 years of age or those listed in historic inventory maps listing buildings of historic significance. *See* ordinances 54–24 and 54–25, Defendant's Exhibit 3. Structures in the Old City District are not subject to regulations as restrictive as structures in the Old and Historic District. The premises at 348 King Street are located in the Old and Historic District. *See* testimony of Charles Chase, Preservation Officer.

30. No list of BAR-approved or -disapproved colors has ever been published for the Old and Historic District. The architectural historian, Mr. Stockton, testified that the BAR's decisions relevant to color appear to have been made on a case-by-case basis.

31. The testimony of Mr. Stockton, called as Plaintiff's witness, supports the conclusion that the BAR has done an outstanding job of preserving the historical ambiance and integrity of the Old and Historic District, and of King Street in particular. Stockton testified that the BAR's efforts have increased tourism in the City. Stockton cited the following three examples of "well-known lapses" in the exercise of good judgment by the BAR: (1) the construction of a modular, freeway style BP gas station within one block of 348 King Street; (2) the destruction of a 19th century

building, the Victoria Hotel, on King Street, which had become dilapidated, and its replacement with a one-story bank building; and (3) the building of the "Neo–Chateauesque" Omni Hotel, which Stockton admitted was a good post-modern design but which bore little relationship to the surrounding area. Significantly, Stockton agreed that the authority of the BAR should be expanded to preserve historic structures, agreed that the BAR must have wide parameters within which to operate, agreed that the ordinances must be somewhat broad to give the BAR the requisite discretion to decide what is, for example, "intense and lurid" color, but rejected the notion that the ordinances are vague or overbroad. Thus, while Stockton agreed that the ordinances were reasonable, he disagreed with their application to prohibit Plaintiff's mural. In other words, Stockton believed that because the first floor of 348 King Street had been modernized, and because the area was frequented by youthful and artistic visitors, a colorful, artistic mural was appropriate to its location.

32. The court agrees with Stockton's expert opinion that the BAR has had a beneficial influence on the historic preservation effort in Charleston. The court finds it highly significant that Stockton could enumerate only three "lapses" in the 64 year history of the BAR. Currently the BAR processes nearly 1200 applications per year, although only a small percentage pertain to murals. The sheer number of applications which must be considered for widely varying types of structures, in vastly differing locations, lends further support to the testimony of several witnesses that it would not be feasible to draw narrowly tailored ordinances governing each and every specific for every location.

33. Furthermore, the City introduced persuasive evidence justifying several of the known "lapses." A dilapidated convenience store formerly occupied the site of the modern BP station, and there was widespread agreement that a large commercial hotel such as the Omni was needed for the revival of the downtown business area. Even when the BAR authorized demolition of the previous historic building located on the Omni site, it ordered the facade relocated to Meeting Street, so as to preserve the historic structure.

34. The Mayor of the City of Charleston, Joseph P. Riley, Jr., a lifelong resident of the City, also testified. He stated that the Charleston historic preservation ordinances were the first enacted in the United States and that they have been adopted by many cities across the nation. He further testified that the ordinances were critical to preserve the ambience and quaint charm of the City. He testified that there were numerous other outlets in Charleston for mural artists to display their work, both in interior locations of the Old and Historic District as well as numerous exterior locations outside the Old and Historic District.

35. During the Mayor's testimony, Plaintiff stipulated that the Charleston historic preservation ordinances had substantial government purposes of preserving aesthetics and property values and promoting economic prosperity from tourism. Plaintiff further stipulated that the ordinances, in fact, advanced those substantial government purposes, except as to art, which Plaintiff contends the ordinances fail to promote.

36. The Mayor defended the latitude given to the BAR by the ordinances, on the ground that so many types of historic structures exist throughout the City, that no "laundry list" of permissible displays could be drawn for each distinct site. The Mayor further testified that the citizens of Charleston have a special interest in controlling changes affecting their realm, and that color was one aspect of the realm necessary to preserve the beauty of the City. He also stated that harmonization of color scheme was critical to continuing to attract tourists to Charleston, which is the major economic industry. He concluded by asserting that if this mural were allowed to be displayed in the heart of the Old and Historic District, the special nature of that area of Charleston would be lost, resulting in adverse economic effects. The court finds this testimony credible.

37. Much of the Mayor's testimony related to the "Christmas Mural," a city-sponsored holiday mural that was formerly located at 275 King Street on a vacant Lerner's

storefront. This mural is depicted in Plaintiff's Exhibit 11, and shows a number of Charleston-style buildings set against the backdrop of a star-lit blue sky. The Christmas mural was considerably larger than Plaintiff's mural, and covered the broad expanse of an entire storefront on King Street. It also contained colors similar to Plaintiff's mural. Although the Christmas Mural was originally designed for temporary display of less than 30 days, so that under BAR custom no permit was required, it actually was on display for an eleven month period, during which time no permanent permit was obtained. It was eventually painted over by the City Maintenance Department and now that store has a white-washed storefront with a "For Sale" sign in the window. *See* Plaintiff's Exhibit 10.

38. Although Plaintiff attempted repeatedly to establish inconsistent application of the historic preservation ordinances by allusion to the Christmas Mural, the court finds that numerous and significant differences explain the different result in that case. First, a number of witnesses testified, and the court found during its view of the site, that the abandoned Lerner Shop building is a modular, contemporary facade, built in the 1940s–1950s. Thus, the graphics and colors of the Christmas Mural might be considered appropriate for that location and that holiday season, but not as a permanent addition to a traditional late Federal style 1830s building such as 348 King Street. Although the court finds it anomalous that the City allowed the Christmas Mural to remain for an 11 month period without permanent permit, the court finds credible the testimony of the Mayor and BAR Preservation Officer Chase that leaving that mural up for an extended period on a very modern building on King Street was preferable to having a vacant storefront on display on one of the most heavily traveled thoroughfares in downtown Charleston.

39. Plaintiff attempted to illustrate inconsistent application of the historic preservation ordinances by introducing numerous photographs of murals, signs or other colorful displays in Charleston. Many of these purported "inconsistencies" were, in fact, not matters subject to BAR jurisdiction at all, or were, in fact, structures that were never permitted by the BAR and were ordered removed. Thus, these examples were, for the most part, either irrelevant to the matter at issue or were supportive of the City's claim that inappropriate structures are ordered removed. For example, the following are irrelevant because no BAR jurisdiction extends to: colorful windsocks hanging in front of a store, *see* Plaintiff's Exhibit 10; temporary signs, *see* Plaintiff's Exhibit 8; and items not affixed to store windows which are simply hanging in the window, *see* Plaintiff's Exhibit 15, depicting a display of colorful badges in a window. Similarly, no BAR jurisdiction extends to murals in the Old City on buildings less than 75 years of age, such as Vanessa's Beauty Shop, *see* Plaintiff's Exhibit 27, which the court nevertheless viewed during its inspection. A window mural of a train, *see* Plaintiff's Exhibit 18, was ordered removed by the BAR. Another, fairly small, pastel-colored mural of a laughing dolphin was also ordered removed by the BAR, *see* Plaintiff's Exhibit 12. A second mural of dolphins, *see* Plaintiff's Exhibit 24, was not approved by the BAR. Like Plaintiff's mural, it was painted without securing prior permission of the BAR, and was ultimately covered up by the property owner at BAR request. A single-colored mural silhouette of a parade of ducks with balloons located at 324 King Street, *see* Plaintiff's Exhibit 6, was approved by the BAR, but a Goody Two Shoes sign on the overhanging canopy was ordered removed. The court observed this mural during its view of the area and concluded that the duck mural, although more visible to street traffic than Plaintiff's mural, was much smaller and lower than Plaintiff's mural and that its placement on the lower portion of a modern storefront justified different BAR treatment. Similarly, the court found credible the BAR's explanation as to why Plaintiff's Exhibit 9, a black and white window mural of a French diner painted as part of the renovation of a French restaurant located at 337 King Street, was appropriate in size (as approximately 3' × 5' and much smaller than Plaintiff's mural) and appropriate in location. The court viewed this display during its inspection. The court also

viewed the locations depicted in Plaintiff's Exhibits 13, 14, 16 and 17, and agrees with the testimony of BAR Preservation Officer Chase that the signs for these fast-food facilities (none of which are murals) are small in relation to the buildings, and thus appropriate in both proportion and location.

40. Plaintiff also took issue with the BAR's approval of three permanent murals: (1) The Places with The Past Exhibit, House of the Future, located in a deteriorated residential neighborhood at 44 America Street in the Old City, *see* Plaintiff's Exhibit 2 at page 187, depicting an outdoor structure of a typical Charleston single house; (2) The *Hatman* Mural, at the corner of Broad and Church Streets in the Old and Historic District, Plaintiff's Exhibit 22, discussed above; and (3) The Tank Mural located at 701 East Bay Street in an industrial area across from the shipyard at Port Center, Plaintiff's Exhibit 25. The court heard extensive testimony regarding these displays, and visited each site during the view. For reasons set forth below, the court finds that each of these exhibits is distinguishable from Plaintiff's mural and represents an appropriate exercise of discretion by the BAR.

41. The House of the Future is not a mural at all, but rather is an example of site-specific art conceived by internationally recognized artist David Hammons. The exhibit was first conceived as part of the Spoleto Art Festival, an annual arts festival in Charleston, and was originally designed to be a temporary structure during the festival. The exhibit was received so positively in the surrounding African–American community where it was constructed that the City, upon clamor by local residents, agreed to allow the exhibit to be a permanent installation. It has remained for five years.

42. The House of the Future is a recreated illustration of a typical Charleston single house with wood siding and a metal roof, and which is a single door wide. It is a "house-cum-sculpture", complete with a second story piazza, and has been used to promote pride in the African–American community. As one commentator remarked, "[T]his house should be used to foster pride in neighborhood houses through awareness education. Local children felt deprived because they had to live in old houses, but if they recognized that their homes were the same as the houses downtown, then maybe they would take pride in the place in which they lived and in their place in history." Plaintiff's Exhibit 2 at 185–86. The House of the Future bears the following quotation from African–American author Ishmael Reed on the side of the house:

The Afro–American has become heir to the myths that it is better to be poor than rich, lower class than middle or upper, easy going rather than industrious, extravagant rather than thrifty, and athletic rather than academic.

43. Several notable characteristics distinguish the House of the Future exhibit from Plaintiff's work. First, it should be noted that the House of the Future is located in an economically-depressed residential neighborhood that is in the Old City, which, as noted earlier, is not subject to the exacting criteria of the Old and Historic District. Second, and most important, as the court noted during its view, the House of the Future blends in with the surrounding Charleston style homes; it is, in fact, a mini-example of hundreds of homes in the surrounding community, constructed in similar shape, color, design and materials. Although the House contains a few idiosyncratic features, the BAR was justified in exercising its discretion to conclude that overall it represented a harmonious addition to the neighborhood. Accordingly, the court finds no unequal treatment by the BAR based upon the House of the Future exhibit.

44. As noted above, the Hatman Mural appears to be an antebellum recreation of a cartoon character comprised entirely of hats. The mural was most likely first conceived to promote a hat store. It has a longstanding presence in the Old and Historic District. It is painted in pastel-shades reminiscent of Charleston's famous "Rainbow Row" colors. It is not large. Based on the testimony received, and the court's view of the Hatman Mural, the court finds the BAR's exercise of discretion in permitting the Hatman Mural to remain and, indeed, to require its repainting along historically accurate lines, to be reasonable.

45. The tank mural, Plaintiff's Exhibit 25, is a tank with a scene containing a commercial message painted on it. It is located in a combined office and industrial area that is across from the shipyard. It is not in the Old and Historic District, but again exists in the less exacting Old City District. Although there are a few old brick homes nearby, the court noted during its view that those historic homes were in disrepair and appeared to be abandoned. Modern apartments are also in the vicinity.

46. Preservation Officer Chase testified that a mural has existed on that tank for a considerable period of time. In fact, when the industrial site on which the tank sits was undergoing renovation, the BAR refused to allow the mural to be removed entirely from the tank because it had become part of the historical ambiance of the surrounding area. The BAR allowed the tank to be repainted with a new commercial message, but insisted that the scene in the mural remain. Based on the testimony at trial, and the court's view, the court finds the tank mural to be an appropriate exercise of the BAR's discretion. It represents a totally different mural from Plaintiff's mural, and is in a vastly different commercial and industrial area in which such a mural is harmonious.

47. Another exhibit challenged by Plaintiff is the structure known as the "Camouflage House," depicted at pages 176–181 of Plaintiff's Exhibit 2. It, too, was part of the Spoleto Festival and was a temporary exhibit for that summer, not exceeding four months in display, and required repainting of the house to original color upon the exhibit's removal.

48. The Camouflage House was a testament to historic preservation efforts following Hurricane Hugo. Based on extensive historical research by a team of preservation consultants with the Historic Charleston Foundation, a paint chart entitled "The Authentic Colors of Historic Charleston" was compiled, which correlates with events of historical significance to Charleston. As one commentator noted:

> The colors continue this story by telling of geographic place (peninsula city red, lowcountry earth brown), its economy (rice field golden brown, crushed oyster shells), architecture (plantation red brown, battery mansion mint), famous families (Aiken light pumpkin, Edmonston peachtone), and military events (Fort Sumter deep stone, rebellion blue black).

*Id.* at 178. The Camouflage House was a typical Charleston single house, one of the single-room-wide houses with piazzas found all over the City. It was painted in a standard woodland camouflage pattern utilizing 72 historically-accurate colors, which were identified, by stencil description, on the house, *e.g.*, "Hugenot Deep Brown," "Peninsula City Red."

49. The Camouflage House was not located in the Old and Historic District, but rather, was located at the dividing line between an historic area in the Old City and a nonhistoric-status community of East Side. In fact, it is only about one and one half blocks from the House of the Future. The exhibit's purpose was described as:

> By using all seventy-two colors on one house in a standard woodland camouflage pattern, [the artists] focused on aspects of the city's urban preservation (the buildings that lie outside the historic district and whose residents do not have the means to undertake exacting restorations) and the military (its active role today as the largest employer in the greater Charleston area) that are less visible, even hidden, or, if you will, camouflaged by the "official" historical reading of the city.

*Id.* at 178. At trial, Plaintiff argued that the BAR should have found the Camouflage House at least equal in garishness to his own mural. Plaintiff ignores the fact that the colors used in the Camouflage House were painstakingly researched and selected to reflect traditional Charleston colors, and did not include any of the bright colors used in Plaintiff's mural. Thus, the BAR's exercise of discretion in concluding that the Camouflage House was harmonious and consistent with the historical ambiance of the area is reasonable under the circumstances.

50. Upon examining the chart entitled "Authentic Colors of Charleston," the court notes that the colors contained in Plaintiff's

mural are not represented in the spectrum of colors contained in the chart. *Compare* Plaintiff's Exhibit 2 at page 178 with Plaintiff's Exhibit 5.

51. Plaintiff also cited the Rainbow Mural, Plaintiff's Exhibit 26, located on the side of a church building that is over 75 years old, and which is located at 148 President Street, just off Spring Street, in a commercial area of the Old City. The mural is of a very large rainbow that appears to be approximately 30 feet long, and which has a figure abreast it in a blue cape holding a Bible and a ladder. The mural says, "Jesus is the only fire escape," and "No more water but by fire next time." At the time of trial, the mural was located on a white Charleston-style wood frame building with a tin roof, that Officer Chase testified was over 75 years old. The mural contains very bright colors, similar to those used in Plaintiff's mural. Chase further testified that the BAR had disapproved the Rainbow Mural as a signage violation under the same provisions of the ordinances used to disapprove Plaintiff's mural, ordinance 54–31. The BAR ordered the building returned to its original condition.

52. Like Plaintiff, the church executed the Rainbow Mural without securing prior permission of the BAR. However, the BAR did not require that the mural be covered pending adjudication of the permit. Plaintiff has pointed to the fact that the mural did not require cover-up pending the BAR hearing, and that the BAR has given the church a three month grace period in which to remove the Rainbow Mural, and repaint it on one of the other, modern church buildings on the premises.

53. The court listened to a tape of the BAR meeting on the Rainbow Mural application. Several church members and officials spoke about the fellowship binding the church members to the mural and to the surrounding community. Officer Chase justified the three month temporary period granted to relocate the mural by explaining that the BAR did not want the church's efforts to be totally wasted, particularly as the Rainbow Mural was going to remain displayed permanently at that location on a modern building. The court finds that the BAR's exercise of discretion as to the Rainbow Mural was reasonable under the circumstances.

54. Preservation Officer Chase testified to his eight years of experience in applying the ordinances. He stated that he does not review, or evaluate, the content of a proposed structure in determining if it complies with the ordinances. Rather, he testified that he reviews the proposed structure's size, shape, general configuration and color to determine its harmony with the surrounding area and conformity with the historic preservation laws. He did not see the assessment of artwork or the content of expression as part of his evaluative criteria, and noted that neither a Picasso nor a DaVinci would have been approved on the wall of 348 King Street. In determining the appropriateness of a proposed structure's size, its dimensions are assessed in relation to the size of the building. He stated that all permanent signs in the Old and Historic District must be approved by the BAR. Based on his experience in applying the ordinances for eight years, Chase testified that the historic preservation ordinances could not be made more specific because of the great variety of architectural styles existing in Charleston. The court finds this testimony credible.

55. William David Evans, a preservation architect, former BAR chairman for three years, and BAR member for eight years, also testified. He stated that assessment of viewpoint, message, or content plays no part in BAR review. He outlined a two-step evaluation process whereby the first consideration is to study the building, and the second consideration is to review the harmonization of the proposed structure to the building. He, too, agreed with the testimony of the Mayor, Officer Chase, and Plaintiff's own expert, Stockton, that the ordinances could not be drafted more narrowly unless the City undertook a complete catalogue and inventory of each and every structure in the Old and Historic District, and every potential change that could be made. He did not find that feasible. The court finds this testimony credible.

56. Plaintiff also called as his witness Edward C. McGuire, Dean of the School of the

Arts at the University of Charleston. He noted that art is a highly emotionally charged medium of expression. He testified that Charleston has a long tradition of public art, and that murals are an important part of public art. He found Plaintiff's mural to be an important work of art, and stated that he could not distinguish between approved and unapproved murals under the ordinances. He further stated his belief that abstract art could not be displayed in the Old and Historic District, and that the BAR's efforts could have a chilling effect on the artistic community.

57. Although Dean McGuire, testifying about an admittedly "emotionally charged medium," is certainly entitled to his opinion, it is not one joined by this court for several reasons. First, it was apparent at trial that Plaintiff, his counsel, and Dean McGuire were misinformed as to the status of several other murals in Charleston. As noted above, Plaintiff submitted photographs of several other murals, and complained that he was unable to distinguish his mural from those. The City proved, however, that many of those murals had, in fact, been rejected by the BAR, some, *e.g.*, the Rainbow Mural, on the same grounds that Plaintiff's mural was rejected. Thus, Dean McGuire's testimony concerning his inability to fathom permitted murals from nonpermitted murals was based on several faulty assumptions. Second, Dean McGuire admitted that Plaintiff's mural differed from most public art in that it contained a commercial sign or slogan in the middle of it. Third, as the testimony of Officer Chase and the Mayor bore out, McGuire's assertion that abstract art cannot be displayed in the Old and Historic District is in error in light of the existence of numerous interior and some exterior opportunities for display. Finally, the court is somewhat puzzled about Dean McGuire's recharacterization of the 348 King Street area. He first described the area as "bland" in a letter to the BAR written in support of Plaintiff's application, *see* Defendant's Exhibit 1. He later testified that the street was "uplifting." The court finds it difficult to reconcile these two characterizations.

## CONCLUSIONS OF LAW

1. *Relevant Historic Preservation Ordinances of the City of Charleston.* The following City of Charleston ordinances apply to this dispute. Although all of the ordinances affecting the Old and Historic District are reproduced in Defendant's Exhibit 3, portions of the most relevant ones are set forth below for purposes of completeness.

Section 54–23 Purpose of creating districts.

In order to promote the economic and general welfare of the City of Charleston and of the public generally, and to insure the harmonious, orderly and efficient growth and development of the municipality, it is deemed essential by the city council of the City of Charleston that the qualities relating to the history of the City of Charleston and a harmonious outward appearance of structures which preserve property values and attract tourist and residents alike be preserved; some of these qualities being the continued existence and preservation of historic areas and buildings; continued construction of buildings in the historic styles and a general harmony as to style, form, color, proportion, texture and material between buildings of historic design and those of more modern design; that such purpose is advanced through the preservation and protection of the old historic or architecturally worthy structures and quaint neighborhoods which impart a district [sic] aspect to the City of Charleston and which serve as visible reminders of the historical and cultural heritage of the City of Charleston, the state, and the nation.

Section 54–24 Designation of Old City District and Old and Historic Districts; definitions.

. . . . .

For the purposes of this article, "exterior architectural appearance" shall include architectural character, general composition and general arrangement of the exterior of a structure, including the kind, color and texture of the building material and type and character of all windows, doors, light fixtures, signs and appurtenant ele-

ments, visible from a street or public thoroughfare.

For the purposes of this article, "structure" shall include walls, fences, signs, light fixtures, steps or appurtenant elements thereof.

Section 54–25 Construction or demolition of building in districts; permit required; certificate of approval.

(a) No structure which is within the Old and Historic District shall be erected, demolished or removed in whole or in part, nor shall the exterior architectural appearance of any structure which is . visible from the public right-of-way be altered until after an application for a permit has been submitted to and approved by the Board of Architectural Review.

(f) Any person requesting a permit under this section and article shall be entitled to a hearing on such request before the Board of Architectural Review.

Section 54–27 Meeting of board.

The Board of Architectural Review may meet at any time upon call of the chairman and, in addition, shall within fifteen (15) days after notification by the administrative officer of the filing of an application for a permit to demolish any building in whole or in part, hold a public hearing upon each application. At least three (3) days' notice of the time and place of such hearing shall be given by the administrative officer as follows:

(a) In writing to the applicant.

(b) In writing to all persons or organizations who have filed an annual written request for such notices and have paid an annual fee, not to exceed twenty-five dollars ($25), to cover the costs involved.

(c) By publication in the form of an advertisement in a newspaper of general circulation within the city.

Section 54–29 Pre-application review of plans by board required; procedure.

Prior to the preparation of working drawings and specifications or calling for proposals or bids from contractors, prospective property developers, owners or agents shall prepare preliminary scale drawings and outline specifications, including color samples for outside work, for review and informal discussion with the Board of Architectural Review. The purpose of this review shall be to acquaint the developer, owner or agent with standards of appropriateness of design that are required of his proposed development.

Section 54–30 Contents of application.

(1) ... Every application ... shall be accompanied by drawings signed by the architect or draftsman and submitted in triplicate for the proposed alterations, additions or changes and for new construction of buildings or property use. As used herein, drawings shall mean plans and exterior elevations to scale, with sufficient detail to show, as far as they relate to exterior appearances, the architectural design of the buildings, including proposed materials, textures, and colors, including samples of materials or color samples, and the plot plan or site layout ...

Section 54–31 Board of Architectural Review; powers and duties.

(1) In passing on an application to ... alter the exterior architectural appearance of any existing structure, the Board of Architectural Review shall consider, among other things, the historic, architectural and aesthetic features of such structure, the nature and character of the surrounding area, the use of such structure and the importance to the city.

(2) In passing upon an application for new construction in an old and historic district, the Board of Architectural Review shall consider, among other things, the general design, scale of buildings, arrangement, texture, materials and color of the structure in question, and the relation of such elements to similar features of structures in the immediate surroundings. The Board of Architectural Review shall not consider interior arrangement or interior design; nor shall it make requirements which are not in harmony with the prevailing character of Charleston, or which are obviously incongruous with this character.

(3) The Board of Architectural Review may refuse a permit ... [for] any struc-

ture within the old and historic district, which in the opinion of the Board of Architectural Review, would be detrimental to the interests of the old and historic district and against the public interests of the city. (8) In case of disapproval, the Board of Architectural Review shall state the reasons therefor in a written statement to the applicant and make recommendations in regard to the appropriateness of design, arrangement, texture, material, color and the like of the property involved. (9) Among other grounds for considering a design inappropriate and requiring disapproval and resubmission are the following defects: Arresting and spectacular effects, violent contrasts of materials or colors and intense or lurid colors, a multiplicity or incongruity of details resulting in a restless and disturbing appearance, the absence of unity and coherence in composition not in consonance with the dignity and character of the present structure ...

2. *Standing.* As noted above, the City abandoned its defense that Plaintiff lacked standing because he did not own the mural or the building upon which it was displayed. At trial, Plaintiff's counsel informed the court that 348 King Street had been listed for sale by its owner, Ron Klenk. Counsel conceded that should the property be sold, the new owner would have the right to remove Plaintiff's work, possibly mooting Plaintiff's request for relief as to the specific mural at issue here. Although Plaintiff sought Ron Klenk's attendance at trial, Klenk was out of the country and process could not be served.

For Article III standing, a plaintiff must have a distinct and palpable injury, a fairly traceable causal connection between the injury and the challenged conduct of the defendant, and there must be a substantial likelihood that the relief requested will redress or prevent the injury. *Mangini v. R.J. Reynolds Tobacco Co.,* 793 F.Supp. 925 (N.D.Cal.1992). *See also Associated Builders & Contractors v. Perry,* 16 F.3d 688, 690 (6th Cir.1994). The plaintiff must assert his own right and not rest his claim on the legal rights or interests of third parties. Moreover, the plaintiff's injury must not be shared in equal measure by all or a large class of citizens, and his interest must arguably be within the zone of interests intended to be protected by constitutional guarantee. *Mangini,* 793 F.Supp. 925. Courts must consider both constitutional standing requirements and prudential concerns in determining whether a plaintiff has standing. *Feltman v. Prudential Bache Securities,* 122 B.R. 466 (S.D.Fla.1990).

At least one court has found that an artist who sold his work to the Government lacked standing to pursue a claim regarding its removal, *see Serra v. United States General Servs. Admin.,* 847 F.2d 1045 (2d Cir. 1988). This court, however, concludes that Plaintiff satisfies the elements of Article III standing. The artist in *Serra* was not precluded by an ordinance from displaying a certain form of expression in a certain area. Here Plaintiff has alleged that enforcement of the historic preservation ordinances has frustrated his efforts towards exterior display of his pop surrealistic artwork in the Old and Historic District. Moreover, Plaintiff testified that another property owner in the Old and Historic District sought to have him create similar artwork on an exterior wall but that he is restrained from doing so for fear the work would not be permitted. Thus, it appears that even if the dispute over the mural at 348 King Street became moot, Plaintiff's efforts would be thwarted again by enforcement of the ordinances. Accordingly, the court concludes Plaintiff has standing to pursue this claim.

3. *Art as Protected Speech for First Amendment Analysis.* Artwork, like other nonverbal forms of expression, may be speech for First Amendment purposes. *Piarowski v. Ill. Comm. College,* 759 F.2d 625, 628 (7th Cir.), *cert. denied,* 474 U.S. 1007, 106 S.Ct. 528, 88 L.Ed.2d 460 (1985) (ordering relocation of artwork on college campus); *Serra v. United States General Servs. Admin.,* 847 F.2d 1045 (2d Cir.1988) (artist, who had sold a sculpture to the Government, failed to prove that the decision ordering removal of the sculpture was a content-based decision).

4. *Importance of Uncensored Artistic Expression.* "One of the fundamental rights

secured by the First Amendment is that of free, uncensored artistic expression even on matters trivial, vulgar or profane." *Berger v. Battaglia,* 779 F.2d 992, 1000 (4th Cir.1983) (blackface comedy entertainment). Accordingly, the Fourth Circuit Court of Appeals found in *Iota XI Chapter of Sigma Chi Frat. v. George Mason Univ.,* 993 F.2d 386 (4th Cir.1993), that a college fraternity's "ugly woman contest" was inherently expressive and entitled to protection under the First Amendment, even as low grade entertainment intended to convey a message. Thus, the court concludes that the mere fact that Plaintiff's work might be aesthetically unattractive to some persons does not diminish its First Amendment protection.

■ 5. *Relevancy of the Nature of the Forum of Expression.* The Government's ability to restrict First Amendment activity depends upon the nature of the forum involved. *Chad v. Fort Lauderdale,* 861 F.Supp. 1057 (S.D.Fla.1994). Generally, the public forum doctrine has application only to activities occurring on public property. However, because of 348 King Street's abutment and close proximity to the public sidewalks, the court has considered whether the doctrine has application. *Compare Davenport v. City of Alexandria,* 710 F.2d 148 (4th Cir.1983) (street musician challenge to use of public sidewalks). However, "property does not lose its private character merely because the public is generally invited to use it for designated purposes." *Lloyd Corp., Ltd. v. Tanner,* 407 U.S. 551, 572, 92 S.Ct. 2219, 2230, 33 L.Ed.2d 131 (1972) (shopping center not a public forum). "The essentially private character of a store and its privately owned abutting property does not change by virtue of its being large or clustered with other stores. *Id.* Even activity occurring on publicly-owned property, such as ingress-egress sidewalks to a post office, does not occur in a public forum. *United States v. Kokinda,* 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990).

As noted above, no evidence exists that 348 King Street or the mural wall have been dedicated to public expression. Nor do the ordinances distinguish between structures existing on private or public land. Accordingly, the court has concluded that the public forum doctrine has no application here. This case is more akin to the situation in which ordinances restrict a private property owner's use of his property in some manner. *See, e.g., Ladue v. Gilleo,* —— U.S. ——, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (striking ordinance banning the display of signs from private property); *Arlington County Republican Comm. v. Arlington County,* 983 F.2d 587 (4th Cir.1993) (striking ordinance limiting to two the number of temporary signs that could be displayed on private property). There is, however, the substantial additional factor here of expression occurring in a historic preservation area.

6. *Necessity of Court's View in Case of this Nature.* Full and proper consideration of regulations in a historic or special district where architectural style, community character and conformity of structures to the area are key issues requires a view of the areas in question by the finder of fact. *See Davenport v. City of Alexandria,* 710 F.2d 148 (4th Cir.1993) (remand ordered for additional findings of fact as to nature of Old Town in Alexandria, Virginia). In the present case, the court conducted a view of 13 locations agreed to by counsel and has made findings of fact as to the nature of the area.

■ 7. *Historic Preservation Goals as a Valid Exercise of Police Powers.* A city has the constitutional power to regulate the use of private property in the interest of historic preservation. *Penn Central Transport Co. v. New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). *See generally* Annotation, *Statutes Protecting Historical Landmarks,* 18 A.L.R.4th 991 (1982). Although challenges to most historic preservation laws have been made under Takings and Due Process Clauses of the United States Constitution, U.S. Const. Amends. 5, 14, or under the Equal Protection Clause, U.S. Const. Amend. 14, principles enunciated in those cases have a bearing on this dispute.

In *Penn Central Transport. Co. v. New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), the owner of a railroad terminal challenged under the Takings Clause the New York City Landmarks Preservation Commission's refusal to approve plans to

construct a 50–story office building over Grand Central Terminal. In rejecting the owner's claim, the Court recognized:

> Over the past 50 years, all 50 States and over 500 municipalities have enacted laws to encourage or require the preservation of buildings and areas with historic or aesthetic importance. These nationwide legislative efforts have been precipitated by two concerns. The first is recognition that, in recent years, large numbers of historic structures, landmarks, and areas have been destroyed without adequate consideration of either the values represented therein or the possibility of preserving the destroyed properties for use in economically productive ways. The second is a widely shared belief that structures with special historic, cultural, or architectural significance enhance the quality of life for all. Not only do these buildings and their workmanship represent the lessons for the past and embody precious features of our heritage, they serve as examples of quality for today. 'Historic conservation is but one aspect of the much larger problem, basically an environmental one, of enhancing—or perhaps developing for the first time—the quality of life for people.'

*Id.* at 107, 98 S.Ct. at 2651 (citations and footnotes omitted). In another historic preservation case from New Orleans, the United States Supreme Court recognized a city's power to determine that activities of street peddlers might interfere with the charm of a historic district and should thus be substantially curtailed. *See New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976). In rejecting the plaintiff's Equal Protection challenge to the ordinances affecting the New Orleans "tout ensemble," the Court stated:

> The City Council plainly could further that objective [to preserve the appearance and custom valued by the Quarter's residents and attractive to tourists] by making the reasoned judgment that street peddlers and hawkers tend to interfere with the charm and beauty of a historic area and disturb tourists and disrupt their enjoyment of that charm and beauty, and that such vendors in the Vieux Carre, the heart of the city's tourist industry, might thus

have a deleterious effect on the economy of the city. They therefore determined that to ensure the economic vitality of that area, such businesses should be substantially curtailed in the Vieux Carre, if not totally banned.

*Id.* at 303, 96 S.Ct. at 2517.

Similarly, in *Maher v. New Orleans,* 516 F.2d 1051 (5th Cir.1975), the plaintiff challenged the historic Vieux Carre ordinances regulating the preservation and maintenance of buildings in that section of the city popularly known as the French Quarter. Like Plaintiff here, the plaintiff in *Maher* asserted that the regulation provided no objective criteria to guide officials charged with administering it, and that the ordinances effected a taking of his property. In rejecting these claims, the Fifth Circuit observed:

> The court is not free to reverse the considered judgment of the legislature that it is in the public interest to preserve the status quo in the Vieux Carre and to scrutinize closely any proposed change in the ambiance by private owners. Where a legislative determination is 'fairly debatable, the legislative judgment must be allowed to control.' We thus conclude that, considering the nationwide sentiment for preserving the country's heritage and with particular regard to the context of the unique and characteristic French Quarter, the objective of the Vieux Carre Ordinance falls within the permissible scope of the police power.

*Id.* at 1060. Like the City of Charleston, New Orleans had not promulgated formal standards to be applied in each and every instance to guide officials in the resolution of preservation efforts. Importantly, the Fifth Circuit rejected the plaintiff's claim that such formal standards were necessary to satisfy due process, even though the court observed that "past enforcement of the Ordinance does not seem to have been uniformly predictable," *id.* at 1061.

Although Plaintiff here attempted to show that the City's enforcement of the preservation ordinances as applied to murals had been arbitrary and inconsistent, the court concludes that Plaintiff was mistaken as to

the permitted status of several present and former murals, and that the City advanced legitimate, nonarbitrary reasons for the few instances in which a deviation from the ordinances appeared to exist. For example, the Christmas Mural was allowed to remain because it was better than a vacant storefront, and it had been painted on a modern structure.

In *New Orleans v. Pergament,* 198 La. 852, 5 So.2d 129 (1941), the court upheld an ordinance prescribing maximum dimensions on signs in the historic district against a modern gas station owner's challenge that the ordinances did not prescribe uniform standards or denied him equal protection. The court stated:

> [T]here is nothing arbitrary or discriminating in forbidding the proprietor of a modern building, as well as the proprietor of one of the ancient landmarks, in the Vieux Carre to display an unusually large sign upon his premises. The purpose of the ordinance is not only to preserve the old buildings themselves, but to preserve the antiquity of the whole French and Spanish quarter, the tout ensemble, so to speak, by defending this relic against iconoclasm or vandalism. Preventing or prohibiting eyesores in such a locality is within the police power and within the scope of this municipal ordinance. The preservation of the Vieux Carre as it was originally is a benefit to the inhabitants of New Orleans generally, not only for the sentimental value of this show place, but for its commercial value as well, because it attracts tourists and conventions to the city, and is in fact, a justification for the slogan, America's most interesting city.

*Id.* at 857, 5 So.2d at 130. *See also New Orleans v. Levy,* 223 La. 14, 64 So.2d 798 (1953) (rejecting the plaintiff's facial invalidity and equal protection challenges to portions of historic preservation ordinance prohibiting his placement of illuminated sign and pink plastic on building).

*State v. Wieland,* 269 Wis. 262, 69 N.W.2d 217 (1955), was a mandamus action to compel a building inspector to issue a permit for the plaintiff to erect a residence. The court upheld a village zoning ordinance requiring,

before issuance of a permit, a finding by the village building board that the exterior architectural appeal and functional plan of the proposed structure would not be at variance with other structures in the neighborhood. The court found the ordinance a valid exercise of police power which was not so indefinite or ambiguous to violative due process.

In *Mayes v. Dallas,* 747 F.2d 323 (5th Cir.1984), the plaintiff, a residential home owner in a historic preservation district in Dallas, sought to paint his brick home and construct a walkway with pylons across his front lawn. He alleged denial of due process because the ordinances did not provide objective, specific standards that would prevent the arbitrary exercise of power by the city. The court found that the ordinances' mandates that "all building facade material shall be architecturally and historically appropriate" and "the manner in which materials are used . . . and the fashion in which elements . . . are utilized shall be compatible and harmonize with the existing structures in the block" provided adequate guidelines to satisfy due process. The court concluded:

> [T]he ordinance is precise where possible—such as in delineating the district, and in defining the nature of the alterations that require approval, including the principles and often specific criteria by which alterations are to be determined as appropriate or not—, while the regulatory process is accomplished through personnel with proper qualifications, and an elaborate decisionmaking and appeal process provides for ultimate review by the City Council.

*Id.* at 325.

Although there are very few cases challenging historic preservation ordinances on First Amendment grounds, the few that have addressed the issue are instructive. In *Bohannan v. San Diego,* 30 Cal.App.3d 416, 106 Cal.Rptr. 333 (Ct.App.1973), a retail business owner challenged under the Takings Clause and First Amendment free speech principles historic preservation ordinances requiring the use of materials and styles in conformity with the historical sites in the district, and regulations imposing size, location and content restrictions on signs in the district. In

rejecting plaintiff's claims, the court noted as to the First Amendment claim:

> As to signs in the area, plaintiff makes a similar contention, claiming regulation of their size, location, content and composition deprives their owners of the right to advertise. It is obvious the provision in question does not deprive property owners in the area of the right to use signs; instead, it regulates and restricts that use for the purpose of preserving the historical atmosphere of the area which, for the reasons heretofore stated, is a proper exercise of police power.

*Id.* at 422, 106 Cal.Rptr. at 337.

In *Sleeper v. Old King's Highway Regional Historic District Commission,* 11 Mass. App.Ct. 571, 417 N.E.2d 987 (1987), a landowner challenged a historic district commission's denial of a permit to erect a 68 foot radio antenna in his backyard. In rejecting his claim that denial of the permit infringed on his free speech rights to pursue his hobby as an amateur radio operator, the court recognized that reasonable restrictions on the time, place and manner of free speech are consistent with the First Amendment, *citing Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). The preceding cases are consistent with this court's conclusion, outlined below, that Plaintiff has failed to prevail on his First and Fourteenth Amendment claims.

■ 8. *"As applied" challenge to Historic Preservation Ordinances.* An "as applied" challenge is proper when testing the validity of facially valid restrictions on speech. *Hess v. Indiana,* 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973). Such analysis should be performed to test the constitutionality of a particular application of a law prior to addressing any other constitutional challenges. *Board of Trustees of the State University of New York v. Fox,* 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). Accordingly, this court will consider Plaintiff's argument that the historic preservation ordinances are unconstitutional as applied.

■ The court has struggled to determine whether the status of Plaintiff's proposed mural as "pure speech" or "commercial speech" has a bearing on the court's analysis and, if so, how the mural would be classified. A lesser degree of First Amendment protection is accorded commercial speech than other constitutionally guaranteed expression. *Edge Broadcasting Co. v. United States,* 5 F.3d 59 (4th Cir.1992). The court has found above that Plaintiff's mural is a hybrid work, combining elements of pure and commercial speech. The court has found credible Plaintiff's testimony that his pop surrealistic art promotes a message of diversity and tolerance. That message is, however, tied to expression promoting a commercial establishment, a restaurant.

A slightly different, less exacting four-part inquiry determines the constitutionality of a restriction on commercial speech. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). That test is whether the commercial free speech: (1) concerns lawful activity and is not misleading; (2) whether the asserted governmental interest is substantial; (3) whether the regulation directly advances the governmental interest asserted, and (4) whether the regulation is not more extensive than necessary to serve that interest. *Id.,* 447 U.S. 557, 100 S.Ct. 2343.

■ The identification of speech as pure or commercial is not always an easy task. As the Supreme Court has observed, "This very case illustrates the difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." *Cincinnati v. Discovery Network Inc.,* —— U.S. ——, 113 S.Ct. 1505, 1518, 123 L.Ed.2d 99 (1993). The Court has offered at least two definitions of commercial speech. They include (1) that commercial speech is expression related solely to the economic interests of the speaker and its audience, *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), and (2) that commercial speech does no more than propose a commercial transaction, *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). In applying the preceding definitions, the court finds significant the

phrase "related *solely* to the economic interests." The court finds that the expression contained in Plaintiff's mural extends beyond merely the economic interest of attracting patrons to the Treehouse Grill or proposing a commercial transaction. Accordingly, the court concludes that a pure speech analysis should be applied.

 The historic preservation ordinances are a place and manner regulation for First Amendment purposes because they control the location and manner of expression in a narrowly drawn geographic area. The constitutionality of a place and manner restriction on pure speech turns on a three-part inquiry whether: (1) the regulation is content neutral;[4] (2) the regulation is narrowly tailored to serve a significant governmental interest; and (3) the regulation leaves open ample alternative channels for communication. *Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).

Courts have recognized the validity of size and color restrictions as a form of manner regulation affecting several types of speech. Thus, in *Regan v. Time, Inc.,* 468 U.S. 641, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984), the Court upheld size and color restrictions under a federal law that governed a publisher's illustration of federal currency in a magazine.

The determination whether a regulation is content-based or content-neutral is a critical classification in First Amendment jurisprudence. The terms "content-based" and "content-neutral" do not, however, mean that when a reviewing official must examine the format or mode of proposed expression to determine if the proposed activity runs afoul of the regulation, the review is "content-based." In numerous cases the United States Supreme Court has upheld, as content-neutral, ordinances in which some reviewing official had to evaluate the format of the proposed activity to determine its conformity to the ordinances. *E.g., Regan v. Time, Inc.,* 468 U.S. 641, 104 S.Ct. 3262, 82

L.Ed.2d 487 (1984). The Fourth Circuit has recognized: "That a regulation requires some examination of the speech upon which it has impact does not make the regulation content-based. In particular, the government may validly examine *the mode of delivery of speech* to determine whether it is delivered in conformity with a "manner" restriction, provided that the restriction does not discriminate based upon the content of the speech." *The Chesapeake and Potomac Tel. Co. of Va. v. United States,* 42 F.3d 181, 186 (4th Cir.1994) (regulations affecting speech in the form of videoprogramming are not content-based because format and content are distinguishable, and there was no evidence that the regulation's manifest purpose was to regulate speech because of the message conveyed).

 The Charleston ordinances' color, size, and other restrictions affect only the format or manner in which Plaintiff's artwork may be displayed. No evidence was produced that BAR officials reviewed or intended to stifle a proposed alteration's message; rather, the officials' inquiry was a limited one, directed only to surveying the proposed alteration's mode of delivery of speech to determine its compliance with specified regulatory criteria.

Other cases have upheld color and size restrictions. In *Gold Coast Pub. Inc. v. Corrigan,* 42 F.3d 1336 (11th Cir.1995), the court of appeals sustained uniform color and size restrictions of newsracks as a valid example of time, place and manner regulation. The court found the restrictions were narrowly tailored to promote the legitimate objectives of the city to promote aesthetics. *See also Graff v. City of Chicago,* 9 F.3d 1309 (7th Cir.1993) (upholding as a valid manner regulation an ordinance imposing uniform color requirements of newsstands to promote aesthetics). Aesthetic goals may not justify a total ban on certain forms of expression in certain locations, *see Multimedia Pub. Co. of South Carolina v. Greenville–Spartanburg Airport Dist.,* 991 F.2d 154 (4th Cir.1993) (striking down airport ban of all newsracks).

---

**4.** "Regulations that are unrelated to the content of the speech are subject to an intermediate level of scrutiny." *Turner Broadcasting System, Inc. v.*

*Federal Communications Commission,* —— U.S. ——, 114 S.Ct. 2445, 2459, 129 L.Ed.2d 497 (1994).

■■■ In determining a regulation's content-neutrality, the main inquiry is whether the government is regulating speech because of disagreement with its message. *Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). A regulation may be content-neutral even though it has an incidental effect on some speakers or messages but not others, as long as it serves some purpose unrelated to the content of regulated speech. *Id.* Moreover, the government may validly examine the *mode of delivery* of speech to determine whether it is delivered in conformity with a place and manner restriction, provided that the restriction does not discriminate based on the content of the speech. *The Chesapeake and Potomac Tel. Co. Of Va. v. United States,* 42 F.3d 181 (4th Cir.1994).

The plain terms of the challenged ordinances do not, on their face, confer benefits or impose burdens on speakers based upon the content of the speech regulated. *Id.* The ordinances do not attempt to stifle, suppress or interfere with the content or message of protected speech. Neither was there, based on the evidence adduced at trial, a shred of evidence that the regulations' "manifest purpose was to regulate speech because of the message it conveys." *Turner Broadcasting System, Inc.,* 114 S.Ct. at 2461. Neither the stated purpose of the ordinances, nor the testimony concerning the ordinances' design and operation, supports such a conclusion. At most the ordinances require BAR officials to review the mode of delivery of a proposed alteration to gauge its conformity with the specifically enumerated factors to be considered. Although the ordinances may have incidental effect on some speakers such as Plaintiff, *e.g.,* a painter who aspires to use allegedly lurid colors to express himself, that reason, in itself, is insufficient to strike the ordinances as long as they serve some purpose, *e.g.,* promotion of tourism, that is unrelated to the content of speech. Thus the court finds as to element (1) of the three-part inquiry that the historic preservation ordinances are content-neutral place and manner regulations subject to an intermediate level of scrutiny.

Having determined, therefore, that the ordinances are valid content-neutral place and manner regulations affecting pure speech in a historic preservation area, the court next considers whether the regulations are narrowly tailored to serve a significant governmental interest.

■■■ It is well settled that aesthetic interests, promotion of tourism, economic growth, and preservation of property values are significant governmental interests. *See New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976). The Supreme Court in *Members of City Council of Los Angeles v. Vincent,* 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), found that aesthetic interests, and the desire to avoid "visual clutter," were sufficiently substantial interests to justify a content-neutral prohibition against the use of billboards on public property. A government has a more significant interest in the aesthetics of designated historic areas than nonhistoric areas. *Messer v. Douglasville,* 975 F.2d 1505 (11th Cir. 1992).

■■■ The remaining question, therefore, is whether the ordinances are narrowly tailored to serve those interests. The Supreme Court expressly rejected the "less-restrictive alternative analysis" test for manner regulations in *Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), and made clear that the appropriate inquiry is whether the City has adopted an ordinance that "is not substantially broader than necessary." *Ward,* 491 U.S. at 800, 109 S.Ct. at 2758. Based on the testimony at trial, the court concludes that the ordinances are not substantially broader than necessary. *See* testimony of Officer Chase, Mayor Riley, Mr. Stockton, Mr. Evans. The court finds the City could not promote its interests in maintaining an aesthetically harmonious historic area through other, substantially less broad means than the ordinances at issue.

■■■ The final requirement under the "as applied" analysis is whether the regulations leave open ample alternative channels of communication. This requirement is met because Plaintiff's work may be exhibited at numerous locations in the Old and Historic

District. For example, a sign by Plaintiff with the same format and colors as Plaintiff's mural is approximately 10 feet from the mural wall. The ordinances do not circumscribe the display of artwork in interior locations, or in areas beyond the relatively small Old and Historic District.

The court thus concludes that the Charleston historic preservation ordinances are content-neutral and narrowly tailored to serve the substantial governmental interests of maintaining harmonious structures in the historic district, which advances tourism, economic growth and property values. The ordinances further leave open ample channels of communication for Plaintiff's message. Accordingly, the ordinances are valid under the First Amendment as a reasonable regulation of the place and manner of expression.

■ 9. *Facial Invalidity arising from Vague Ordinances.* Laws that are unconstitutionally vague fall because persons who must conform their conduct to the law are entitled to fair notice of what is permitted and proscribed. *Village of Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). Fair notice protects those who might otherwise stray into the regulated area, prescribes standards for law enforcers, and preserves legitimate activity against the chill that flows from a law of uncertain scope. *Grayned v. Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

■ Plaintiff challenges the facial validity of the Charleston historic preservation ordinances on the ground that they are vague and fail to provide any meaningful standards against which conduct can be measured. Plaintiff contends that such scheme confers an unbridled grant of discretion on BAR officials and denies him due process of law. In the area of free expression, a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint. *Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). The principal First Amendment risk associated with an unbridled licensing scheme is self-censorship by speakers to avoid being denied a license and the difficulty of reviewing content-based censorship as applied without standards by which to measure the licensor's actions. *Id.* In *Lakewood v. Plain Dealer Pub. Co., id.,* the Court struck as facially invalid an ordinance granting a mayor unfettered authority to grant or deny applications for annual permits to place racks on public property. The danger of an unfettered grant of discretion is especially threatening in annual licensing schemes in which the applicant's conduct must be periodically gauged.

The Supreme Court has established that only certain classes of statutes are subject to facial attacks. The rule has emerged that a facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers. *Lakewood,* 486 U.S. at 759, 108 S.Ct. at 2145. The law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks. As noted above the BAR's review is not content-based and therefore, under *Lakewood,* no merits assessment of a facial validity challenge is required. However, even if it were, Plaintiff's challenge would fail for the following reasons.

The court notes that ordinance 54–28, entitled "Guidance standards; maintenance of consistent policy," requires the BAR to maintain files, drawings and other documents that "may serve as general guides to appropriateness or as expression of objectives to prospective developers or property owners." Ordinance 54–28 sets out a process whereby an informal preapplication review is conducted so that a preliminary assessment of the project's compliance with standards, and suggestions for modifications, can be made. Plaintiff did not engage in preapplication review with the BAR but rather executed his finished work before a permit application was made. Ordinance 54–31(1) provides that the BAR shall consider "the historic, architectural and aesthetic features of such structure, the nature and character of the surrounding area, the use of such structure and the importance to the city." Subsection (2) of that provision directs that the BAR shall consider

"the general design, the character and appropriateness of design, scale of buildings, arrangement, texture, materials and color of the structure in question, and the relation of such elements to similar features of structures in the immediate surroundings" and shall prevent developments "not in harmony with the prevailing character of Charleston." Subsection (3) allows permit refusal when the structure would "be detrimental to the interests of the old and historic district and against the public interests of the city." Subsection (8) requires a written order denying a permit which shall make recommendations as to design, arrangement, texture, material, color and the like. Subsection (9) lists some, but not all, grounds for considering a design inappropriate: arresting and spectacular effects, violent contrasts of materials or colors and intense or lurid colors, a multiplicity or incongruity of details resulting in a restless and disturbing appearance, and an absence of unity and coherence not in consonance with the character of the existing structure or the neighborhood. Any proposed alteration detrimental to the public interest may be refused under subsection (10).

The court disagrees with Plaintiff that the ordinances confer unfettered authority on the BAR. Unlike the scheme stricken in *Lakewood,* where the mayor could deny a parade permit by simply stating "it is not in the public interest," 486 U.S. at 767, 108 S.Ct. at 2149, here the BAR's refusal must be reduced to writing, with consideration given to certain enumerated factors. Moreover, Plaintiff's argument that the ordinances fail to identify specifically what colors constitute "lurid" colors, or what appearance constitutes a "restless appearance" is without merit. The Supreme Court has never imposed a requirement that an ordinance specifying grounds for denial of a permit exhaust the range of possibilities in order to withstand facial challenge. For example, in *Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), where a concert sponsor challenged New York ordinances governing a band shell, the Court rejected the argument that city guidelines providing that the city was "to provide the best sound for all events" were unconstitu-

tionally vague or that greater precision was required. The Court noted,

> While these standards are undoubtedly flexible, and the officials implementing them will exercise considerable discretion, perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity. *See Grayned v. City of Rockford,* 408 U.S. 104, 110 [92 S.Ct. 2294, 2299, 33 L.Ed.2d 222] (1972) (Condemned to the use of words, we can never expect mathematical certainty in our language); *see also Kovacs v. Cooper,* 336 U.S. 77, 79 [69 S.Ct. 448, 449, 93 L.Ed. 513] (1949) (rejecting vagueness challenge to city ordinance forbidding 'loud and raucous' sound amplification).

491 U.S. at 796, 109 S.Ct. at 2756. The Charleston ordinances sufficiently circumscribe the BAR review process. Accordingly, the court finds no merit to Plaintiff's due process challenge.

10. *Analogy of Present Controversy to Zoning Regulations Developed to Control Secondary Effects of Certain Expression.* Zoning regulations are a permissible means for restricting certain types of speech to certain locales within a city. *Guschke v. Oklahoma City,* 763 F.2d 379, 385 (10th Cir. 1985) (citing *Young v. American Mini Theatres,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976)). Typically these regulations have been used to control the location of expression that may have a deleterious "secondary effect" on the community. For example, in *Renton v. Playtime,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), the Court upheld as a valid form of time, place and manner regulation a zoning ordinance that prohibited the location of an adult theatre within 1000 feet of a residence or church. Although recognizing that the classification of an ordinance as "content-based" or "content-neutral" may not always be easy, the Court concluded that the ordinance was a content-neutral ordinance because the city's intent in passing the ordinance was unrelated to suppression of the message. Applying *Renton,* the court in *East Brooks Books, Inc. v. Memphis,* 48 F.3d 220 (6th Cir.1995), sustained the validity of a city ordinance regulating sexually-oriented businesses. The court ana-

lyzed the restriction as a content-neutral regulation because it was aimed at the secondary effects of those businesses and was not enacted to curtail expression.

The present case bears some similarity to the foregoing cases. The court concludes that the City had no intent to stifle artistic expression in passing the Charleston historic preservation ordinances. The Charleston ordinances serve much the same purposes as zoning regulations, and comparable principles apply. The ordinances serve to regulate the manner and form of Plaintiff's expression in a fashion similar to that in *Renton.* Moreover, the Mayor and several other witnesses testified that allowing unbridled display of artwork or other structures in the Old and Historic District would have a negative secondary effect on aesthetics, property values and tourism. Thus, this court has found *Renton*'s consideration of secondary effects helpful in developing a framework for the present case.

 11. *Equal Protection.* Plaintiff's Complaint asserts:

The BAR's decision to deny Plaintiff the right to exhibit his mural while allowing other murals to be exhibited at the same or nearby locations is a violation of Plaintiff's right to equal protection under the law as guaranteed by the First and Fourteenth Amendments to the Constitution of the United States ...[5]

As noted above, Plaintiff's proof at trial fell far short of establishing that murals similar in composition, color or specific location to his had been permitted whereas his had been denied. No arbitrary action nor invidious discriminatory intent in enforcement has been shown.

It may also be the case that Plaintiff is contending that the ordinance unconstitutionally classifies applicants for certain structures. If Plaintiff is pursuing some sort of argument that the ordinance unconstitutionally classifies structures into those containing lurid colors, unorthodox size, or restless appearance, which are refused, and those which present elements that are harmonious with the surrounding community, which are permitted, then this equal protection argument, too, must fail.

In *New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976), the Supreme Court upheld under the Equal Protection Clause an ordinance which prohibited pushcart vendors from operating in the French Quarter unless they had done so continuously for the preceding eight years. The Court considered the ordinance an economic regulation, passed pursuant to the city's police power, which was aimed at enhancing the vital role of the French Quarter's tourist appeal in the New Orleans economy. Similarly, in this case ordinance 54–23 states the ordinances are adopted "to promote the economic and general welfare of the City." The court finds that the ordinances seek to preserve Charleston's tourist appeal, enhance property values and are, therefore, economic regulations passed pursuant to the City's police power.

 As demonstrated above, Plaintiff has failed to prove a violation of his First Amendment right to free speech, either under the "as applied" test or the facial validity challenge. When local economic regulation is challenged solely as violating equal protection, courts consistently defer to legislative determinations as to the desirability of particular statutory classifications. *Dukes,* 427 U.S. at 301, 96 S.Ct. at 2515. Unless the classification trammels a fundamental right (which is not established here because the court has found no First Amendment violation above), or the classification draws upon an inherently suspect distinction such as race, religion or alienage (not established here because painters who aspire to use certain colors, sizes or manner of expression are not a suspect class under the Constitution), then the constitutionality of the classification

---

**5.** The court notes that both Plaintiff's Proposed Findings of Fact & Conclusions of Law (Revised) and Plaintiff's Supplemental Findings of Fact and Conclusions of Law failed to address the equal protection argument. It is unclear, therefore, whether Plaintiff has abandoned this claim and intends to proceed only under the First Amendment "As Applied" and Facial Validity arguments. The court has, however, undertaken a review of the equal protection challenge and finds it to be without merit.

scheme is presumed and the scheme must only be rationally related to a legitimate state interest. *Id.* In other words, minimal scrutiny is applied. "When social or economic legislation is involved, the states are permitted wide latitude in adopting classifications to further legitimate governmental purposes." *Sylvia Dev. Corp. v. Calvert County,* 48 F.3d 810 (4th Cir.1995). The court finds that the end sought by the ordinance—the promotion of economic and general welfare through the imposition of requirements of harmony in style, form, color, proportion, texture, and material, *see* ordinance 54–23, is a legitimate governmental purpose. Further, under the applicable minimal scrutiny test, the court finds that the classification scheme prohibiting lurid color, size or form of expression that is inconsistent with the surrounding area is "rationally related to a legitimate state interest." *Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 442, 105 S.Ct. 3249, 3255, 87 L.Ed.2d 313 (1983).

Although Plaintiff may argue that the City's proscription against lurid colors, inappropriate size, or restless appearance in the Old and Historic District has not been proved to attract tourists or significantly improve the economy, "states are accorded wide latitude in the regulation of their local economies under the police powers, and rational distinctions may be made with substantially less than mathematical exactitude." *Dukes,* 427 U.S. at 303, 96 S.Ct. at 2516. The Fourth Circuit has stated, "From the beginning of civilized societies, legislators and judges have acted on various unprovable assumptions," and "nothing in the Constitution prohibits a State from reaching a conclusion and acting on it legislatively simply because there is no conclusive evidence or empirical data." *Hart Book Stores, Inc. v. Edmisten,* 612 F.2d 821 (4th Cir.1979) (upholding, against equal protection and First Amendment challenges, a North Carolina statute prohibiting the location of two adult-oriented businesses in one building). The City could rationally conclude that structures encompassing nontraditional colors in the Old and Historic District would deter tourists from visiting the Old and Historic District, which would then impact the City's economy and property values in the area. The court

cannot say this judgment was irrational and thus a denial of equal protection.

### CONCLUSION

The court, having considered all evidence received at the trial of this matter and having studied the applicable legal authorities, finds that Plaintiff has failed to show a constitutional violation. Accordingly, the Clerk of Court shall enter judgment for the City of Charleston.

IT IS SO ORDERED.