**Robert BURKE, Doctor,**
**Plaintiff–Appellant,**

v.

**CITY OF CHARLESTON,**
**Defendant–Appellee.**

No. 95–2475.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 6, 1996.

Decided March 18, 1998.

---

**ARGUED**: Robert Marchant O'Neil, The Thomas Jefferson Center for the Protection of Free Expression, Charlottesville, VA, for Appellant. John Hamilton Smith, Young, Clement, Rivers & Tisdale, L.L.P., Charleston, SC, for Appellee. **ON BRIEF**: J. Joshua Wheeler, The Thomas Jefferson Center for the Protection of Free Expression, Charlottesville, VA; Gregory S. Forman, Charleston, SC, for Appellant. Stephen P. Groves, Stephen L. Brown, Young, Clement, Rivers & Tisdale, L.L.P., Charleston, SC; William B. Regan, Frances I. Cantwell, Regan & Cantwell, Charleston, SC, for Appellee.

Before WILKINSON, Chief Judge, LUTTIG, Circuit Judge, and DAVIS, United States District Judge for the District of Maryland, sitting by designation.

Vacated and remanded by published opinion. Judge DAVIS wrote the majority opinion, in which Judge LUTTIG joined. Chief Judge WILKINSON wrote a dissenting opinion.

## OPINION

DAVIS, District Judge:

Appellant Robert Burke, an artist working in South Carolina, challenges the constitutionality of a City of Charleston historic preservation ordinance that governs proposed alterations to exteriors of structures located within historic areas of the city. Burke painted a mural on the exterior wall of a restaurant located in an historic area, but the city's Board of Architectural Review invoked the ordinance and denied the restaurant owner a permit to display the mural. Burke filed suit, and the district court, after a nonjury trial, entered judgment in favor of the city. Burke appeals.

We do not reach the merits of Burke's constitutional challenge because we find that Burke lacks standing to assert a First Amendment claim. Burke relinquished his First Amendment rights when he sold his mural to the restaurant owner, who alone has the right to *display* the mural. Thus, lacking a legally cognizable interest in the *display* of his work, Burke has not suffered an injury sufficient to satisfy the constitutional requirements for standing. Moreover, even were we to conclude that Burke has suffered injury-in-fact, a decision from this Court in Burke's favor would not redress directly, if at all, the injury Burke presumably suffers. Accordingly, we vacate the judgment and remand with instructions to dismiss the complaint.

## I.

Ron Klenk (who is not a party to this appeal) owns a late federal style building located at 348 King Street in Charleston, South Carolina. Klenk operated a night club on the second floor of his building. Klenk decided to open a bar and grill on the first floor of the building. Impressed with the "world of creatures" Burke had created and displayed at an art show held in the night club, Klenk commissioned Burke to paint a mural depicting the creature world on the exterior masonry wall of the building, which is visible from King Street. At the time of the commission, a mural depicting a willow tree adorned the exterior wall. Burke painted over the willow tree mural with his "colorful cartoon of imaginary characters, including smiling mountains, flying creatures with impractically small wings and tiny yellow bipeds." Through the mural, Burke attempts to convey a message of tolerance for diversity by showing different creatures coexisting peacefully.

Klenk's property is located within the Old and Historic District ("District") of Charleston. The District boasts the largest collection—numbering approximately 2800—of historically significant buildings in the United States. The District is the heart of tourist interest in Charleston. In 1931, to further the establishment of an architecturally harmonious environment throughout the District, Charleston enacted its historic preservation ordinances and established its Board of Architectural Review ("BAR"). The BAR reviews all proposed exterior or fixed structural alterations, signs, murals, or other exterior changes to structures in the District before they are effected. The BAR's purpose is to ensure that alterations are complementary in style, form, color, proportion, texture, and material. Thus, those seeking to make such alterations must submit to the BAR an application for a permit and a proposal describing the work to be done.

Neither Burke nor Klenk applied for a permit before Burke began to paint the mural. The BAR discovered Burke's mural while Burke was painting it, and issued a stop work order. Subsequently, Klenk—not Burke—filed an application for a permit. The parties agreed to cover the mural with plywood pending approval of Klenk's permit application. Subsequently, they agreed to keep the mural covered for the duration of this litigation.

Burke's mural generated public controversy and extensive media attention. Many city residents opposed Burke's mural; others were favorably impressed. A fast food restaurant outside the District commissioned Burke to paint two murals similar to the creature world mural he painted on Klenk's wall. According to Burke, another restaurant owner, whose building is located within the District, approached Burke about the possibility of painting a creature world mural at his restaurant; nothing came of this contact, however, as Burke felt he was precluded by the ordinance from painting another creature world mural in the District. Eventually, the BAR held a public hearing during which Burke, represented by counsel, submitted letters from various supporters of the mural. Others spoke against the mural at the hearing. At the conclusion of the hearing, the BAR issued a report denying Klenk's permit application. The BAR stated that the mural's size, scale, and "garish" colors did not blend with the surrounding area and that the mural was inappropriate for display in the District.

Burke, but not Klenk, filed suit in district court, alleging that the BAR's decision to deny Klenk's permit, the lack of articulable standards for approving work, and the use of a vague and overbroad ordinance, violated Burke's free speech and equal protection rights under the first and fourteenth amendments. In its answer, the city raised Burke's lack of standing as an affirmative defense. Later, however, the city voluntarily abandoned this defense. At the conclusion of a non-jury trial, the district court issued its findings of fact and conclusions of law in a thoughtful and carefully-reasoned opinion. *Burke v. City of Charleston*, 893 F.Supp. 589 (D.S.C.1995).

The district court addressed the issue of standing, noting the Second Circuit rule that an artist who sells his work to the government relinquishes his right to have his work displayed. *See Serra v. United States Gen. Serv. Admin.*, 847 F.2d 1045 (2d Cir.1988). The district court distinguished *Serra*, however, on the ground that the artist in that case was not precluded by an ordinance from displaying his expression. The court also

noted that the historic preservation ordinance would operate to thwart Burke's future efforts because it would preclude him from painting another creature world mural for the interested restaurant owner whose property is also located within the District. The court concluded that Burke had standing to pursue his claims, but ultimately held that Burke failed to prove his constitutional rights were violated, and entered judgment in favor of the city as to all claims. Burke brought the present appeal, challenging only the lower court's ruling on the First Amendment issue, while abandoning his equal protection claim.

## II.

" '[E]very federal appellate court has a special obligation to "satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review," even though the parties are prepared to concede it.' " *Arizonans for Official English v. Arizona*, 520 U.S. 43, ——, 117 S.Ct. 1055, 1071, 137 L.Ed.2d 170 (1997) (quoting *Mitchell v. Maurer*, 293 U.S. 237, 244, 55 S.Ct. 162, 165, 79 L.Ed. 338 (1934)). "And if the record discloses that the lower court was without jurisdiction [a reviewing] court will notice the defect, although the parties make no contention concerning it." *Id.* at ——, 117 S.Ct. at 1072 (quoting *United States v. Corrick*, 298 U.S. 435, 440, 56 S.Ct. 829, 831, 80 L.Ed. 1263 (1936)) (brackets in original). With these guiding principles in mind, we proceed to examine the question whether Burke has standing to bring a First Amendment claim.

■ "Article III of the United States Constitution limits federal courts to resolving actual cases and controversies." *Finlator v. Powers*, 902 F.2d 1158, 1160 (4th Cir.1990). A litigant does not satisfy Article III's mandate merely by "request[ing] a court of the United States to declare its legal rights" in terms "that have a familiar ring to those trained in the legal process." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). Rather, the judicial power to pass constitutional judgment "is legitimate only in the last resort," *Chicago & Grand*

*Trunk R. Co. v. Wellman*, 143 U.S. 339, 345, 12 S.Ct. 400, 402, 36 L.Ed. 176 (1892), and as a necessity in determining "actual cases ... involving issues that are precisely framed by their connection to specific litigants in a concrete context." *Gilles v. Torgersen*, 71 F.3d 497, 500 (4th Cir.1995).[1]

■ The Supreme Court has articulated various rules which govern the justiciability of disputes. The standing requirement, "perhaps the most important" condition of justiciability, *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984), ensures a litigant has a sufficient personal stake in an otherwise justiciable controversy such that the judicial process appropriately should resolve the controversy. *Sierra Club v. Morton*, 405 U.S. 727, 731, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972). While the Supreme Court has not defined standing "with complete consistency," *Valley Forge Christian College*, 454 U.S. at 475, 102 S.Ct. at 760, the irreducible constitutional minimum of standing requires: (1) that the plaintiff personally has suffered actual or threatened injury that is concrete and particularized, not conjectural or hypothetical; (2) that the injury fairly can be traced to the challenged action; and (3) that the injury is likely to be redressed by a favorable decision from the court. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992); *Finlator*, 902 F.2d at 1160. Additionally, the standing inquiry invokes prudential considerations which "add to the constitutional minima a healthy concern that if the claim is brought by someone other than one at whom the constitutional protection is aimed, the claim not be an abstract, generalized grievance that the courts are neither well equipped nor well advised to adjudicate." *Secretary of State of Maryland v. Joseph H. Munson, Inc.*, 467 U.S. 947, 955 n. 5, 104 S.Ct. 2839, 2846 n. 5, 81 L.Ed.2d 786 (1984).

■ Thus, "a plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Moreover, even when a plaintiff satisfies the constitutional requirements for standing, federal courts will not adjudicate a " 'generalized grievance' shared in substantially equal measure by all or a large class of citizens...." *Id.* Finally, the plaintiff's complaint must fall within the zone of interests the statute or Constitution protects or regulates. *Valley Forge Christian College*, 454 U.S. at 475, 102 S.Ct. at 760; *see also Association of Data Processing Service Orgs. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970); *Branch Bank and Trust Co. v. Nat'l Credit Union Admin. Bd.*, 786 F.2d 621, 624 (4th Cir.1986).[2]

### III.

■ Application of these principles to the case at hand persuades us that Burke lacks standing. The speech being regulated or infringed upon in this case is the speech of the owner of 348 King Street; only that person or entity might elect whether to "ex-

---

**1.** Unquestionably, the *Wellman* rule of strict enforcement of the standing requirement has continued vitality. *Raines v. Byrd*, — U.S. —, —, 117 S.Ct. 2312, 2317, 138 L.Ed.2d 849 (1997) ("We have always insisted on strict compliance with this jurisdictional standing requirement.").

**2.** In some instances, courts will relax the prudential limitations because they are outweighed by competing considerations. Among those weightier considerations within the context of the First Amendment is the danger of chilling free speech. *Joseph H. Munson, Inc.*, 467 U.S. at 956, 104 S.Ct. at 2846–47. One who engages in protected activity regulated by statute might elect to discontinue engaging in that activity rather than launch a First Amendment attack. In such a case, society as a whole suffers a loss. *Id.* Thus, courts sometimes permit litigants to challenge a statute "not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). Nevertheless, a *jus tertii* plaintiff is obligated as an initial matter to allege a distinct and palpable injury as required by Article III. *Warth*, 422 U.S. at 501, 95 S.Ct. at 2206–07; *Gilles*, 71 F.3d at 500.

All the members of the panel agree that this is not a proper case for the application of third party standing doctrine.

press" Burke's fantasy, as depicted in the creature world mural, by *displaying* it in the District. Burke relinquished his First Amendment rights embodied in the mural when he effectively sold it to Klenk, by creating it on Klenk's real property. *Cf. Serra*, 847 F.2d at 1049. As Burke conceded at trial, somewhat anomalously, his request for relief would be mooted should Klenk, who had at the time of trial listed the property for sale, sell his property.

Burke has failed to demonstrate injury-in-fact. Whether or not the district court's conclusion that the presence of a *legal* restraint (as compared with an owner's countervailing aesthetic) genuinely distinguishes this case from *Serra*, we fail to discern how the operation of the ordinance in respect to *Burke's* right to artistic expression amounts to a concrete injury, rather than a mere tangential effect, at best. Klenk commissioned Burke to create a work of art, and Klenk had little, if any, input into the creative process. Nevertheless, the legally cognizable injury arising from the Charleston ordinance falls upon the party who alone has the right to *display* the work, not the person who creates it. Put differently, as a matter of Article III standing, the ordinance must be viewed as a regulation of what is *displayed* in the District, not as a regulation of the colors or content of *unexposed* bricks and mortar. On the present record, in respect to the exterior wall of 348 King Street, that person is Klenk and only Klenk.

Thus, if we viewed the ordinance, or the Board's enforcement of it, as does the dissent, as a cause-in-fact of Burke's having to "stop work," we might well be persuaded that Burke has Article III standing to seek relief.[3] Presumably, however, Burke is not interested in continuing to work on a painting that will never be displayed. Obviously, the "mural" could as easily be created in or on a mobile medium (such as the plywood which now covers it), and Burke could work unrestrained by the ordinance in a studio or gallery. Upon delivery of such a composition to Klenk, however, Burke would have no

basis in law to obtain a permit in Klenk's or his own name to display it upon *Klenk's* building. Similarly, he lacks standing in this case to challenge the Board's enforcement of the ordinance against *Klenk*.

Ironically, Burke's own testimony below demonstrated that he largely (if unknowingly) shares this vision of the legal landscape. *See, e.g.,* Supp.App. at 97 ("I believe the government should be involved, but not as far as making laws. I think [the government] should allocate funds to save historic buildings. I think [the government] should help preservationists be organized. But I don't think [the government has] the right to tell someone what they can and can't do, aesthetically, to *their* store front or to *their* house") (emphases added). What is at issue in this case is *Klenk's* right to display what he wishes on his "store front," whoever the artist might be.

The district court identified injury from Burke's testimony that another building owner in the District might, absent the ordinance, commission Burke to paint a mural on his exterior wall. The testimony upon which this finding was based is not included in the Appendices filed with the parties' briefs. Such a potential arrangement—a mere expectancy—does not amount to a concrete, palpable injury. Otherwise, a plaintiff could create standing through the expedience of self-serving declarations amounting to little more than argument rather than demonstrable harm. Standing should not be found on this ephemeral foundation. In any event, as set forth above, Burke is not a house painter, but an artist. His inchoate interest in the display of a work he creates but then sells to another does not confer Article III standing sufficient to challenge an ordinance burdening the right of the owner to *display* the work.

Moreover, even assuming this testimony constitutes evidence sufficient to show injury, an order that the ordinance is unconstitutional would not likely redress Burke's grievance that the King Street mural cannot be displayed in the District. No interested build-

---

**3.** Apparently, the mural was substantially complete when Burke ceased work on it. *See* Supp.

App. at 93–94.

ing owner is obligated to commission Burke to create a mural on his exterior wall. Absent such a commission, our ruling would lie dormant. Indeed, a subsequent owner of 348 King Street, and obviously Klenk himself, would be free at any time to paint over Burke's mural, just as Klenk hired Burke to paint over the willow tree mural that adorned the exterior wall when Klenk purchased the property. Again, an injunction would lack binding or mobilizing effect upon the parties here. The result would be an inappropriate advisory opinion, a result unequivocally barred by our supreme law.[4]

The federal courts are not "publicly funded forums for the ventilation of public grievances or the refinement of jurisprudential understanding." *Valley Forge Christian College*, 454 U.S. at 473, 102 S.Ct. at 759. Rather, they are venues preserved for those who have a direct stake in the outcome of the controversy which they seek to litigate. Like the thousands upon thousands of Charlestonians and Charelston visitors who would likely take pleasure in Burke's creation were they only allowed to view it there on Klenk's wall, Burke himself, although the creator of the work, lacks such a direct stake, and as a consequence the district court lacked jurisdiction to adjudicate his claims.

## IV.

For the reasons discussed above, the judgment of the district court is

*VACATED AND REMANDED WITH DIRECTIONS TO DISMISS THE COMPLAINT.*

WILKINSON, Chief Judge, dissenting:

The majority would deny standing to every artist whose commissioned work was suppressed by the state. I believe Burke does possess standing to challenge Charleston's historic preservation ordinance. He was commissioned to paint a mural on the exterior wall of a building in historic downtown Charleston. Charleston's Board of Architectural Review ("BAR") learned of the project and, pursuant to the preservation ordinance, directed Burke to stop work on his mural. The owner of the building applied to BAR for a permit that would allow completion of the work. Burke agreed to cover the unfinished mural with plywood pending BAR's decision. BAR eventually denied the permit application on the ground that the mural was aesthetically incompatible with Charleston's historic district. Because display is not permitted, Burke's mural remains under plywood.

This course of events unequivocally gives Burke standing to challenge the city ordinance. Because of the ordinance, Burke has suffered the concrete injury of having to stop work and board up his mural, shielding it from view. An order from this court invalidating the ordinance that keeps the mural under plywood would certainly redress this injury. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992) (outlining injury, causation and redressability requirements). The district court even identified another concrete economic opportunity that Burke lost by virtue of the Charleston ordinance. *Burke v. City of Charleston*, 893 F.Supp. 589, 604 (D.S.C.1995). Moreover, artists receive future commissions precisely because their work is seen and displayed and admired, which Burke's cannot be so long as his mural remains under wraps.

But of course a plaintiff need not even suffer economic injury in order to protest the suppression of speech by the state. Plaintiffs protesting infringement of intellectual property interests by another private party often advance allegations of economic loss. *See* 15 U.S.C. § 1117 (trademark); 17 U.S.C. § 107 (copyright); 35 U.S.C. § 284 (patent). By contrast, plaintiffs asserting First Amendment challenges to state action have relied upon the intrinsic value of speech in

---

4. Indeed, for all that appears in the present record, Klenk, as a property owner in the District, might well be supportive of the *constitutionality* of the preservation ordinance, and would limit his challenge (were he to make one) to its application in a particular case. No doubt, similar real world considerations should inform interpretation of the Article III standing requirement; federal courts have no warrant, and we ought not, to adjudicate disputes resting on speculation over such matters.

count less cases where no economic interest was at stake. *See, e.g., McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (invalidating ban on anonymous campaign literature as violative of First Amendment); *City of Ladue v. Gilleo,* 512 U.S. 43, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (invalidating broad municipal ban on residential signs that prohibited resident from displaying anti-war sign in window of her home). Burke's standing is firmly grounded on just such an intangible, but no less legally cognizable, interest.

The majority holds that artists have no First Amendment rights once they sell their work. The majority says this is so because only the owner then has the right to display the art. Display of a piece of art may well be "speech" by its owner, as the majority suggests, but I am unwilling to hold that it wholly ceases to be speech by the artist the second it is sold. In fact, "[i]t is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak." *Riley v. National Fed'n of the Blind,* 487 U.S. 781, 801, 108 S.Ct. 2667, 2680, 101 L.Ed.2d 669 (1988). In reality an audience, a paying audience, is the lifeblood of any artist, and it is the rare artist who can sustain his craft without selling many, if not most, of his works. The majority's approach thus has the practical effect of leaving most artists with little protection against government suppression of their speech. This is a sad fate for those whose creative efforts make paintings possible.

The majority makes much of the indisputable fact that the owner may freely raze the building (and the mural painted thereon) for any reason. But two critical facts distinguish the rights of the owner from the powers of the government. First, the city does not stand in the shoes of the building owner vis-a-vis the mural because the government has not bought and paid for the owner's right to dispose of the mural. Therefore the majority's reliance on *Serra v. United States Gen. Servs. Admin.,* 847 F.2d 1045 (2d Cir.1988), is misplaced. Unlike in *Serra,* the government has not purchased the art at issue here. Second, and more fundamentally, there is a world of difference between private conduct that suppresses speech and state action that has the same effect—it is the latter that implicates the fundamental protections of the First Amendment. To equate the waiver of property rights with the waiver of constitutional rights against the government is to obliterate a critical distinction in constitutional law.

Both parties present able arguments directed at the merits of Burke's First Amendment challenge. Burke asserts a core First Amendment interest in artistic speech. Charleston counters with its interest in maintaining the aesthetic integrity of its historic district and the related interests of protecting property values and promoting tourism. Those arguments deserve to be addressed by this court just as they were by the district court. Though I express no view on the constitutionality of Charleston's historic preservation ordinance, I cannot accept the majority's denial of standing. The restrictive rule of standing imposed upon this artist ill befits the Constitution's concern for free expression and speech. *Secretary of State of Maryland v. J.H. Munson Co., Inc.,* 467 U.S. 947, 956, 104 S.Ct. 2839, 2846–47, 81 L.Ed.2d 786 (1984). This case is most straightforward—an artist is simply protesting the suppression of his work by the state. Under the majority rule, if the state boarded up the ceiling of the Sistine Chapel, Michelangelo could not contest the action in court.