**FRIENDS OF THE EARTH, INC.,
and Citizens Local Environmental
Action Network, Inc., Plaintiffs,**

v.

**GASTON COPPER RECYCLING
CORPORATION, Defendant.**

No. CIV. A. 3:92–2574–0.

United States District Court,
D. South Carolina,
Columbia Division.

May 29, 1998.

Bruce J. Terris, Eliot M. Blake, Esquire, J. Martin Wagner, Terris Pravlik and Millian, Washington, DC, Robert Guild, Columbia, SC, Kathleen L. Millian, Terris Pravlik and Millian, Washington, DC, for Plaintiffs.

Harold W. Jacobs, Nexsen Pruet Jacobs and Pollard, James William Potter, Nexsen Pruet Jacobs and Pollard, Columbia, SC, Jeanne M Lyles, Nelson Mullins Riley and Scarborough LLP, Charleston, SC, for Defendant.

### *OPINION AND ORDER*

PERRY, Senior District Judge.

This action was commenced by the plaintiffs, Friends of the Earth, Inc. (FOE) and Citizens Local Environmental Action Network, Inc. (CLEAN) against the defendant Gaston Copper Recycling Corporation pursuant to Section 505 of the Federal Water Pollution Control Act, 33 U.S.C. § 1365. Plaintiffs allege *inter alia* that the defendant has repeatedly violated its National Pollutant Discharge Elimination System (NPDES) Permit Number SC0034541, issued to the defendant by the South Carolina Department of Health and Environmental Control (DHEC) in violation of Section 301(a), 308(a) and 402 of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1311(a), 1318(a) and 1342. Plaintiffs seek a declaratory judgment, injunctive relief, the imposition of civil penalties, attorneys' fees, expert witness fees and costs. The defendant admits its status as a corporation and that, pursuant to Section 402 of the Federal Water Pollution Control Act, DHEC issued NPDES Permit number SC0034541 which governs the defendant's discharge of pollutants into the navigable waters affected by the defendant's facility in Gaston, South Carolina. The defendant denies that it has violated the terms of its NPDES Permit. Additionally, defendant denies FOE's existence as a not for profit corporation organized under the laws of the State of New York and that FOE is a membership organi-

zation with approximately 40,000 members.[1] Defendant also denies CLEAN's existence as a not for profit corporation and its status as "a statewide coalition representing 30 groups and individual members ...."[2] Finally, the defendant asserts that the plaintiffs lack standing to bring this action and it seeks dismissal thereof.

## I

Congress enacted The Federal Water Pollution Control Act (also the Clean Water Act), 33 U.S.C. §§ 1251 *et seq.* "[t]o restore and maintain the chemical, physical, and biological integrity of the Nation's waters." § 1251(a). The Act prohibits the discharge of any pollutant into navigable waters except as authorized therein. 33 U.S .C. § 3111(a). One such exception is stated in 33 U.S.C. § 1342 which established the National Pollutant Discharge Elimination System (NPDES). Pursuant to the exception set forth therein, the Administrator of the Environmental Protection Agency (EPA) may issue permits authorizing the discharge of pollutants in accordance with specified conditions. 33 U.S.C. § 1342(a). Also, each State may establish and administer its own permit program, if the program conforms to federal guidelines and is approved by the Administrator of the EPA. 33 U.S.C. § 1342(b). As to waters subject to an approved state program, the Administrator of the EPA is required to suspend the issuance of federal permits. 33 U.S.C. § 1342(c)(1).

The holder of a state NPDES Permit is subject to both federal and state enforcement action upon failure to comply with the terms of the permit. 33 U.S.C. §§ 1319, 1342(b)(7).

If no enforcement action is taken by federal or state authorities, private citizens may commence civil actions against any person "alleged to be in violation of" the conditions of either a federal or state NPDES Permit. 33 U.S.C. § 1365(a)(1). If the citizen prevails in such action, the court may order injunctive relief and/or impose civil penalties payable to the United States Treasury, 33 U.S.C. § 1365(a). *See Gwaltney of Smithfield v. Chesapeake Bay Foundation, Inc., et al.,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987).

South Carolina has established a federally approved state NPDES program administered by the South Carolina Department of Health and Environmental Control (DHEC). S.C.Code Ann. § 1–23–370 (Law.Co-op.1986). In 1984 a NPDES Permit was issued by DHEC to AT & T Nassau Metals Corporation (defendant's predecessor in title). The permit authorized the discharge of limited quantities of pollutants into the Boggy Branch of Bull Swamp Creek through Outfall 001;[3] it set discharge limitations and monitoring requirements for several pollutant parameters;[4] and it required monitoring on a monthly basis and reporting the monitoring results on a quarterly basis.

In September 1990, AT & T Nassau Metals Corporation sold the property covered by its NPDES Permit to the defendant Gaston Copper Recycling Corporation (GCRC or defendant). Defendant operated the facility under the NPDES Permit previously issued to AT & T Nassau until March 1, 1991 when DHEC issued a new permit to the defendant. The new permit contains two phases of effluent limits. The Phase I effluent limitations are substantially the same as those

---

1. FOE's allegation concerning its corporate status and its status as a membership organization is stated at paragraph 6 of the Complaint. The Answer states that the defendant is "without sufficient information to form a belief regarding the truth of the remaining allegations of paragraph 6 (which describes FOE's corporate and membership organization status) and therefore denies same and demands strict proof thereof."

2. The allegation concerning CLEAN's corporate status and its composition is stated at paragraph 10 of the Complaint. The Answer states that the defendant "is without sufficient information to form a belief regarding the truth of the remain-

ing allegations of paragraph 10 (which describes CLEAN's corporate and membership organization status) and therefore denies same and demands strict proof thereof."

3. "Outfall" is the term used for a discharge point.

4. A "parameter" is any pollutant (e.g., copper zinc) or any water quality indicator (e.g., biochemical oxygen demand, total suspended solids, pH) for which the permit contains one or more discharge limitations.

contained in the AT & T Nassau Permit. The Phase II effluent limits are more stringent for several parameters, including BOD, Cadmium, Copper, Lead, Zinc and pH. The 1991 permit contains a schedule of compliance for defendant to meet the Phase II effluent limits which included: submitting a preliminary engineering report by March 31, 1991; submitting final plans and specifica-

tions for any waste water treatment plant upgrade required to meet Phase II effluent limits by September 1, 1991; and complying with Phase II effluent limits by June 1, 1992. Because of intervening circumstances, DHEC later issued a draft modification to defendant's NPDES Permit to extend the deadline for compliance with the Phase II limits to March 14, 1993.[5]

5. The parties disagree concerning the nature of the intervening circumstances, the reasons they occurred and their impact upon this case. The defendant argues that "[u]pon receipt of the Permit, GCRC immediately began an investigation to determine whether the existing treatment facilities could be operated so as to meet Phase II effluent limits. Tests for this purpose were conducted beginning March 1991 and continuing through mid-April 1991. These tests established that Phase II limits could not be met without a substantial upgrade of the storm water treatment facility.

As soon as this determination was made, GCRC immediately proceeded to investigate numerous types of secondary treatment systems, including carbon filter, reverse osmosis, and Unipure, among others, in an effort to determine the best available to meet the Phase II effluent requirements. These tests were conducted throughout the summer and into the early fall of 1991, before GCRC concluded that the Unipure system would best enable it to meet the stringent, state of the art Phase II effluent limits. Until this selection process was concluded, it was impossible for the engineering consulting firm retained for this purpose to proceed with preparation of final plans and specifications for construction of the upgrade. Since the selection of the Unipure system was not made until the early fall of 1991, the original Permit schedule for the submittal of final plans and specifications to DHEC by September 1, 1991, could not be met. A request, therefore, was made by GCRC for a permit modification to extend the time for delivery of final plans and specifications to DHEC until November 15, 1991. This request was accordingly approved by DHEC and the Permit was modified.

Once the Unipure system was chosen, B.P. Barber & Associates, consulting engineers for GCRC, undertook the preparation of the final plans and specifications for the project. This, among other things, required removal of a portion of the treatment system which was designed to remove PCBs and other organic chemicals from the effluent stream. The Unipure system had to be installed in the same building which contained the primary system and then integrated into it. In the interim, the primary system had to continue to operate throughout the construction period in order to handle the essential storm water discharge. Due to the complexity of the project, and despite considerable overtime by engineers and staff, B.P. Barber & Associates was unable to finalize the plans and specifica-

tions by the extended due date of November 15, 1991. Hence, an additional thirty (30) day extension was sought from, and granted by DHEC. Before the expiration of this thirty (30) day extension, an additional extension was verbally granted by DHEC. Final plans and specifications for the Unipure treatment system were submitted by GCRC on December 23, 1991 which was within the extended period.

Because of workload and intervening high priority projects, DHEC was unable to complete its review of GCRC's plans and specifications until five months later in May 1992, two weeks before the Phase II scheduled implementation date of June 1, 1992. During the interim, because of this delay, it became apparent to GCRC that it would be unable to complete construction of the storm water treatment upgrade in time to meet the Phase II effluent limits by the Permit deadline of June 1, 1992. Hence, on March 24, 1992, GCRC requested a delay in the effective date for the implementation of Phase II limits. DHEC responded on March 25, 1992, stating that due to the fact that GCRC has submitted final plans and specifications for storm water treatment plant upgrade, and by reason of the fact that the Department had not yet reviewed these plans for approval, DHEC would take no enforcement action against GCRC for failure to meet the June 1, 1992 schedule of compliance deadline and would provide five (5) months construction time from final approval of plans and specifications.

On May 14, 1992, DHEC approved the final plans and specifications for the Phase II modifications and issued a State Construction Permit to GCRC to begin construction of the storm water treatment system upgrade. Four days later, on May 18, 1992, DHEC issued a draft modification to GCRC's NPDES Permit to extend the deadline for compliance with Phase II limits to March. DHEC regulations which relate to modification of the final schedule of compliance date of June 1, 1992 to March 15, 1993, require a 30–day comment period after public notice. This notice was published by DHEC on June 15, 1992. On the last day of the 30–day notice period FOE intervened in this process and demanded a public hearing.

The demand for a public hearing by FOE held up issuance of the Permit until March 1993. At that time, the modified Permit was issued with a final schedule of compliance date of April 2, 1993 for completion and implementation of the upgraded storm water treatment system."

## II

On July 13, 1992 plaintiffs' attorneys wrote the Administrator of the EPA, DHEC and the defendant, notifying them of alleged violations of the defendant's NPDES Permit and of the plaintiff's intent, "at the close of the 60 day notice period" to file a citizen suit under Section 505(a) of the Federal Water Pollution Control Act, 33 U.S.C. § 1365(a), "for violation of the permit." Thereafter, on September 14, 1992, plaintiffs commenced this action.

The plaintiffs allege and the defendant denies that the plaintiff Friends of the Earth (FOE) is a not for profit corporation organized under the laws of the State of New York with its principal place of business in Washington, D.C.; that FOE is a membership organization with approximately 40,000 members residing in all the states of the United States; that in this case FOE sues on behalf of itself and its members (Complaint, ¶ 6); that members of FOE reside in the vicinity of or own property or recreate in or near the waters of Boggy Branch of Bull Swamp Creek, the North Fork of Edisto River and tidally related waters affected by the facility's discharge of pollutants pursuant to the defendant's NPDES Permit; that the quality of the water of Boggy Branch of Bull Swamp Creek, the North Fork of the Edisto River and tidally related waters affected by the facility's discharge directly affects the health, economic, recreational, aesthetic and environmental interests of FOE's members (Complaint, ¶ 7); that defendant's actions in failing to monitor and report discharges from the facility as required by its permit interfere with FOE's efforts to research and of its members to monitor the compliance status of South Carolina dischargers with water pollution control laws and to take appropriate action thereon (Complaint, ¶¶ 8, 9).

Plaintiffs also allege and the defendant denies that the plaintiff Citizens Local Environmental Action Network (CLEAN) is a not for profit corporation organized under the laws of the State of South Carolina; that CLEAN is a statewide coalition representing 30 groups and individual members, dedicated *inter alia* to protecting and improving the waters of South Carolina; that the interests of CLEAN and its members have been and are adversely affected by defendant's violation of its NPDES Permit (Complaint, ¶ 10); that members of CLEAN reside in the vicinity of or own property or recreate in or near the Boggy Branch of Bull Swamp Creek, the North Fork of the Edisto River and tidally related waters affected by the facility's discharge of pollutants pursuant to its permit; that the quality of the waters of Boggy Branch of Bull Swamp Creek, the North Fork of the Edisto River and tidally related waters affected by the facility's discharge has adversely affected the health, economic, recreational, aesthetic and environmental interests of CLEAN's members and will continue to adversely affect CLEAN's members (Complaint, ¶ 11); that the interests of CLEAN and its members have been and will be adversely affected by the defendant's violation of the terms of its permit, and interfere with the efforts of CLEAN and its members to research the compliance status of South Carolina dischargers with water pollution control laws and to take appropriate action thereon (Complaint, ¶¶ 11, 12, 13). The plaintiffs allege and the defendant admits that the defendant is a corporation organized under the laws of Georgia (Complaint, ¶ 14); that DHEC issued permit number SC 0034541 to the defendant for its facility; that the permit authorizes defendant to discharge limited quantities of pollutants from its facility into the Boggy Branch of Bull Swamp Creek, a tributary of the North Fork of Edisto River, all of which are navigable waters of the United States (Complaint, ¶ 15). Plaintiffs allege and the defendant denies that defendant has failed to comply with its NPDES Permit (Complaint, ¶ 25). Plaintiffs seek extensive relief including a declaratory judgment, injunction, an order requiring defendant to pay appropriate civil penalties for each violation of its NPDES Permit, an order awarding plaintiffs their costs, including attorney's fees and expert witness fees, and other appropriate relief. In addition to denying the material allegations of the complaint, the defendant asserts that the plaintiffs lack standing to bring this action (Third Defense) and that the complaint fails to state a claim upon which relief can be granted.

Therefore, the defendant seeks dismissal of the complaint and other appropriate relief.

## III

Defendant's assertion that the plaintiffs lack standing to maintain this action is, in essence, a challenge to the Court's jurisdiction to entertain it. *Steel Company, etc. v. Citizens for a Better Environment,* —— U.S. ——, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). As such, it must be and is here considered a threshold question that must be resolved in the plaintiffs' favor before the Court can proceed to the merits.

### A.

"Article III of the United States Constitution limits federal courts to resolving actual cases and controversies." *Burke v. City of Charleston,* 139 F.3d 401 (4th Cir.1998); *Finlator v. Powers,* 902 F.2d 1158, 1160 (4th Cir.1990). A party does not satisfy the mandate of Article III "merely because the party requests a court of the United States to declare its legal rights, and has couched that request for forms of relief historically associated with courts of law in terms that have a familiar ring to those trained in the legal process." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Instead, "[t]he power to declare the rights of individuals and to measure the authority of governments ... 'is legitimate only in the last resort, and as a necessity in the determination of real, earnest and vital controversy.'" *Chicago & Grand Trunk Ry. Co. v. Wellman,* 143 U.S. 339, 12 S.Ct. 400, 36 L.Ed. 176 (1892); *see Burke v. City of Charleston,* 139 F.3d 401 (4th Cir.1998); *see also Gilles v. Torgersen,* 71 F.3d 497, 500 (4th Cir.1995). Therefore, the Supreme Court requires that a litigant have "standing" to challenge the action sought to be adjudicated in the lawsuit. *Steel Company, etc. v. Citizens For a Better Environment,* —— U.S.——, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); *Whitmore v. Arkansas,* 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990); *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). "The standing requirement, perhaps the most important condition of justiciability, ensures that a litigant has a sufficient personal stake in an otherwise justiciable controversy such that the judicial process appropriately should resolve the controversy." *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Sierra Club v. Morton,* 405 U.S. 727, 731, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Burke v. City of Charleston,* 139 F.3d 401 (4th Cir.1998).

The Supreme Court teaches that the "irreducible constitutional minimum of standing" contains three requirements. *Steel Company, etc. v. Citizens For a Better Environment,* —— U.S. ——, ——, 118 S.Ct. 1003, 1016, 140 L.Ed.2d 210 (1998); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). First, there must be alleged (and ultimately proven) an "injury in fact"—— a harm suffered by the plaintiff that is "concrete" and "actual or imminent, not 'conjectural or hypothetical.'" *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990). Second, there must be causation, a fairly traceable connection between the plaintiff's injury and the defendant's challenged action. *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Third, there must be a likelihood that the requested relief will redress the alleged injury. *Id.* at 45–46, 96 S.Ct. 1917; *Warth v. Seldin,* 422 U.S. 490, 505, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). "This triad of injury in fact, causation, and redressability comprises the core of Article III's case—or—controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." *Steel Company, etc. v. Citizens For a Better Environment,* —— U.S. ——, ——, 118 S.Ct. 1003, 1016, 140 L.Ed.2d 210 (1998); *see FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); and *Burke v. City of Charleston,* 139 F.3d 401 (4th Cir.1998). This requirement of proof is emphasized in *Lujan v. Defenders of Wildlife* in the following manner:

The party invoking federal jurisdiction bears the burden of establishing these elements. *See FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); *Warth, supra,* at 508, 95 S.Ct. 2197. Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.' In response to a summary judgment motion, however, the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial . . . .'

504 U.S. at 561, 112 S.Ct. 2130 (citations omitted). An inquiry into standing invokes prudential considerations which "add to the constitutional minima a healthy concern that if the claim is brought by someone other than one at whom the statutory protection is aimed, the claim not be an abstract generalized grievance that the courts are neither well equipped nor well advised to adjudicate." *Secretary of State of Maryland v. Joseph H. Munson, Inc.,* 467 U.S. 947, 955, n. 5, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984); *Burke v. City of Charleston,* 139 F.3d 401 (4th Cir.1998).

### B.

The plaintiffs allege that they have standing to pursue this action both in their own right and on behalf of their "members."

The Supreme Court recognizes that an "association" may have standing to assert the claims of its members even where it has suffered no injury from the challenged activity. *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Maryland Highways Contractors Ass'n v. Maryland,* 933 F.2d 1246, 1250 (4th Cir.1991). Thus, if these plaintiffs are "voluntary membership" organizations and their members have suffered injury that is causally related to the defendant's challenged conduct, plaintiffs' standing to bring this action as the representatives of their constituents is clear.

■ In *Warth v. Seldin,* the Court stated the principle as follows:

Even in the absence of injury to itself, an association may have standing solely as the representative of its members . . . . The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. So long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction.

422 U.S. at 511, 95 S.Ct. 2197 (citation omitted). An association has standing to sue on behalf of its members when (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted, nor the relief requested, requires the participation of individual members in the law suit. *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Maryland Highways Contractors Ass'n. v. Maryland,* 933 F.2d 1246, 1250 (4th Cir.1991).

### C.

During and subsequent to the trial the plaintiffs presented as evidence supporting their standing to pursue this action the following:

(1) The Amended Bylaws of Friends of the Earth;

(2) The Constitution and Bylaws of Citizens Local Environmental Action Network; and

(3) The testimony of several witnesses, including FOE's Secretary and three purported members who testified concerning their alleged injuries.

The impact of that evidence on this case will now be considered.

### (1)

Plaintiffs presented the Amended Bylaws of Friends of the Earth which, in Article I, Section 1, states its purposes as follows:

The corporation is organized exclusively for the promotion of social welfare, to ease the burdens of government and to combat community deterioration, more specifically the following:

To promote, encourage and foster the common good and general welfare of the people of the United States through bringing about civic betterment and social improvement.

To promote, encourage and foster charitable activity as defined within section 501(c)(3) of the 1954 Internal Revenue Code and the rules and regulations promulgated thereunder, more specifically, as described in Regulation 1.501(c)(3)-(d)(2) in that the corporation intends to "combat community deterioration" and aid in the "relief of the poor and distressed," and work for the "advancement of education and science" by specifically engaging in programs to reduce the cost and waste of energy and energy resources and fuels, to combat and eliminate water pollution and air pollution and the ill health resulting from water pollution and air pollution, and to promote the wise management of natural resources for the betterment of mankind.

To stimulate, promote, foster, encourage, and conduct the scientific, technical, economic, and social research and analyses of the consequences of the conservation, preservation, and development of natural resources, and of the production, distribu-tion, and use of energy and energy resources, fuels, and systems.

To promote, encourage, and foster the establishment of organizations of professional persons (including scientists, engineers, advocates, attorneys, economists and others) working in the public interest, as such organizations have come to be defined within the meaning of section 501(c)(3) of the Internal Revenue Code of 1954 and the rules and regulations promulgated thereunder, to aid users of energy, and all citizens whose economic well being and personal health care could be improved by the elimination of the waste of energy and elimination of air pollution and water pollution and other forms of destruction, degradation, and depletion of natural resources.

In Article II, the Bylaws state that the principle office of the corporation shall be located in the District of Columbia.

Article III creates a class of members and provides that the designation, qualifications and rights of members "shall be established from time to time by the board of directors."

The Bylaws provide *inter alia* for the voting rights of members, Article III, § 2; termination of membership by the board of directors or by the "affirmative vote" of two-thirds of all the members of the board where such member becomes ineligible for membership or is in default of the payment of dues, Article III, § 3; and for the reinstatement of a former member, upon written request, filed with the secretary, Article III, § 5. The office of Secretary is created in Article VI. The Secretary is required *inter alia* to keep the minutes of meetings of members and of the board of directors; keep a register of the post office address of each member; perform all duties incident to the office of secretary and such additional duties assigned by the president or chairperson of the board of directors. Article VI, § 10. While the Bylaws do not establish specific criteria for membership, a member may be suspended or expel(ed) for cause or "who becomes ineligible for membership" or "who shall be in default of the payment of dues for the period fixed in Article XI . . . ." Article III, § 3. The amount

of dues, if any, payable by members is determined by the board of directors. Article XI.[6]

FOE did not offer evidence concerning what, if anything, its board of directors have done concerning the "designation of members and the qualifications and rights of members" as required by Article III, § 1 of its Bylaws.

FOE's Executive Director, Velner Smith, testified concerning her duties and responsibilities. Ms. Smith testified that this lawsuit is "one of many" that FOE has undertaken "where we have been alerted to violations of a permit and have worked to compel a change in the operations at a particular plant." She testified that FOE publishes a news magazine which is mailed to its members which informs them about lawsuits sponsored by the organization. She described the manner by which FOE chooses the defendants against whom it institutes citizen suits.[7] She testified that FOE's decision to institute this action was based upon the monitoring reports which defendant filed with the South Carolina Department of Health and Environmental Control (DHEC) which indicated violations of the Clean Water Act.

(2)

Plaintiffs presented the Constitution and Bylaws of Citizens Local Environmental Action Network (CLEAN), which states the purposes of CLEAN as follows:

A. Citizens Local Environmental Action Network shall be organized as a not-for-profit corporation for the purposes of educating South Carolinians about environmental issues affecting them as citizens and ways to address those issues, conducting and publishing research on environmental issues affecting South Carolinians, and conducting education and training.

B. Said corporation is organized exclusively for charitable, educational and scientific purposes, including for such purposes, the making of distributions to organizations that qualify as except [sic] organizations under Section 501(c)(3) of the Internal Revenue Code (or the corresponding section of any future federal tax code).

At Section V the Constitution and Bylaws provide that CLEAN is a membership organization and that "individuals and organizations may become general members— (of CLEAN)— by paying dues set by the Board of Directors and declaring an intent to work for the purposes of the corporation."[8] Mrs. Mildred Myers, co-chair of CLEAN's board of directors testified concerning the purpose of CLEAN and that CLEAN is a general membership organization; that, "concerning how one becomes a member of CLEAN, usually its communities that find themselves

---

**6.** While the Bylaws contain several references to FOE's status as a corporation, the corporate charter was not presented as evidence. Moreover, while the Bylaws state that the principle office of FOE shall be located in the District of Columbia (Article II) no reference to the State in which FOE is incorporated appears in the Bylaws. FOE alleges and the defendant denies that FOE is incorporated in New York. FOE has apparently alleged its place of incorporation in other litigation as the District of Columbia. *See Friends of the Earth, Inc. v. Chevron Chemical Company,* 919 F.Supp. 1042 (E.D.Tex.1996). While it seems obvious that FOE is claiming status as a corporation, it must be remembered that in a case such as this, where the plaintiff's standing is denied and challenged, "the party invoking federal jurisdiction bears the burden of establishing its existence." *Steel Company etc. v. Citizens For a Better Environment,* — U.S. —, — 118 S.Ct. 1003, 1016, 140 L.Ed.2d 210 (1998). And since the requirement of proof on standing is "not a mere pleading requirement but rather an indispensable part of the plaintiff's case, each element must be supported in the

same way as any other matter on which the plaintiff bears the burden of proof, i.e. with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife,* 504 U.S. at 561, 112 S.Ct. 2130.

**7.** Ms. Smith testified that generally, the Terris, Pravlik and Wagner law firm identifies potential violators from reviewing discharge monitoring reports, summarizes the data that is collected and provides the FOE office with a written summary and, thereafter they discuss whether to go forward. Thereupon, Ms. Smith confers with FOE President Brent Blackwelder concerning whether they should proceed.

**8.** The plaintiffs did not present evidence of CLEAN's existence as a corporate body. CLEAN's Bylaws do not reference the state of CLEAN's incorporation. Indeed, the proof of CLEAN's existence as a membership organization is as deficient as that pertaining to FOE. *See* n. 6.

impacted negatively by some environmental issue and ... the members in those communities become a part of CLEAN, ... we also have individual members who have an interest in cleaning up the environment in South Carolina..." and that CLEAN's members are located throughout South Carolina. Ms. Myers testified that the records maintained by DHEC provide the information by which CLEAN decides to file citizen suits. On the other hand, Ms. Myers was "not sure" what procedure was utilized in deciding to institute this action. She testified that "we organize communities when— usually when we are contacted, we organize communities, we help them learn to deal with their local as well as state officials and in some instances federal or state agencies that work with environmental issues, and as a last resort in cases, a lawsuit."

(3)

Guy Jones testified that he is a member of both FOE and CLEAN; that he is a co-owner of and is employed by River Runner Outdoor Center, a retailer of canoes and outdoor equipment and which provides canoe trips for the general public; that a canoe trip involves assembling a group of interested people and taking them to a river or lake area and conducting a canoe or kayaking trip; that these trips occur in rivers and lakes all around South Carolina, including the Edisto; that they canoe from the main stream, an area that is described as Green Pond Church, to Colleton State Park; and from Shill's Bridge to the Edisto Gardens in Orangeburg; and from Rowesville down to a location called Branchville, both of which are on the North Fork of the Edisto; that Rowesville and Branchville are downstream from Bull Swamp Creek; that he plans to guide similar tours in the future; that some River Runner trips begin at Green Pond Church which is approximately eight miles upstream from Colleton State Park which is approximately ten miles below the confluence of the North Fork and South Fork; he described the responsibilities of a guide on a River Runner Canoe trip as including that of ensuring the safety of all participants, including rescuing canoes when they turn over; that on some occasions he must get into the water to assist a member get back into the canoe; that some River Runner clients swim in the river during the course of the trip; that some of their clients fish and presumably eat the fish; that he (Mr. Jones) is concerned about the quality of the water in the rivers in which he canoes; that the business of his company is dependent upon the public's perception that the water quality is good; that he understands that the Edisto may have heavy metals that may be present from the Gaston Copper Plant; that his belief that the amount of pollution he believes to be in water affects his enjoyment of canoeing or swimming in the water; that he agrees with the stated purposes of both FOE and CLEAN. Significantly, Mr. Jones testified he is "not certain" what level of pollutants are in the Edisto; that he is not aware that any customer has canceled a trip with his company because of the operation of defendant; that the North Fork of the Edisto is ten to fifteen miles from Lake Watson; that he does not know what volume of water is discharged into the Edisto Basin or the North Fork of the Edisto; that he does not know the volume of discharge from defendant.

(4)

William McCullough, Jr., testified that he is a member of FOE since 1983, that he engages in water sports, including scuba diving and boating; that he occasionally engages in scuba diving in the Edisto, a place called Pond Pond, south, downstream; that he plans to dive and go boating in the Edisto again in the future; that he is concerned about the quality of the water in which he dives and on which he boats; that he would like to dive in water that is relatively clean; that if the water is known to him to have contaminants, he would be less likely to dive in it; that he agrees with the stated purposes of FOE. Mr. McCullough testified that he does not know whether the North Fork on the Edisto is polluted.

Significantly he did not testify that he has suffered any injury or damage that is fairly traceable to the defendant's challenged conduct.

(5)

Otto Shealy testified that he is a member of CLEAN and that he agrees with CLEAN's goals and activities; that he lives in Swansea, South Carolina where he owns 104 acres of land that includes a man made lake of 67 acres of water; that the defendant is located about four miles upstream from the point where Bull Swamp Creek flows into his lake; that Mr. Shealy and his family engage in swimming, fishing and some boating on his lake "about every other week;" that his grandchildren fish in the lake every day; that he swims in the lake two times per year; that other members of his family swim in the lake "nearly every day, every chance they get;" that he is concerned about the quality of the water in his lake and about the flow of water from the defendant; that he is concerned about the amount of pollution; that he limits the amount of fish he can eat and he limits the amount of time he permits his children and grandchildren to swim in the water; that if there were less pollution in the water he would catch and eat more fish and he would permit his children and grandchildren to swim more frequently; that he believes the amount of pollution in the water on his lake affects the value of his property. He testified that in his lake there is lead, copper, zinc, chromium, nickel, iron and "at one time" PCB's, prior to 1990; that he has not had his water checked since then (1991) and that he does not know what the pollution level in his lake is as of the date of his testimony; that he does not know what impact from 1991 the discharges from defendant have had on his pond; that he knows of no effect the activities of defendant have had on his lake; that his grandchildren fish in the lake every day and that they swim once a day; that he has no intention of selling his land.

9. *See* notes 6 and 8.

10. *Friends of the Earth v. Chevron Chemical Company*, 129 F.3d 826 (5th. Cir.1997). The District Judge had found that, "surprisingly FOE has failed to establish that its board of directors ever took the requisite action to create a class of members to 'Populate' the FOE corporation." *See* 919 F.Supp. 1042 (E.D.Tex.1996), *Rev'd* 129 F.3d 826 (5th Cir.1997).

11. *See e.g., Friends of the Earth v. Chevron Chemical Company*, 129 F.3d 826 (5th Cir.1997);

Significantly, Mr. Shealy did not testify to any injury or damage he has suffered that is fairly traceable to the challenged conduct of the defendant.

IV

■ The absence of proof concerning the corporate status of the plaintiffs FOE and CLEAN[9] has prompted the court to inquire into their respective structures as membership organizations. Additionally, as no evidence was presented that either of the plaintiff organizations has established the memberships provided for in their Bylaws, an initial question exists concerning their standing to pursue this action on behalf of their members. The Fifth Circuit has reversed a decision of the United States District Court for the Eastern District of Texas which dismissed an action commenced by FOE upon grounds that FOE lacked associational standing because it had no members.[10] Additionally, the Court notes that the plaintiff FOE has pursued several actions in federal courts, asserting associational standing on behalf of its members.[11] Therefore, the Court will recognize FOE's associational standing to represent the interests of its members in this case, as an unincorporated association. In like manner, the Court will recognize CLEAN's associational standing to represent the interests of its members.

■ Both of the plaintiff organizations argue that because of their stated purposes, they have standing to pursue this action. The Court rejects this argument and, instead, is governed by the Court's reasoning in *Sierra Club v. Simkins Industries, Inc.*, 847 F.2d 1109, 1113 (4th Cir.1988), observing that "Congress' provisions for citizens suits does not, in itself, establish Article III stand-

*Friends of the Earth v. Consolidated Rail Corp.*, 768 F.2d 57 (2d Cir.1985); *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64 (3d Cir.1990), *cert. denied*, 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991); *Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111 (3d Cir.1997); *Friends of the Earth, Inc. v. Crown Central Petroleum Corp.*, 95 F.3d 358 (5th Cir.1996).

ing . . . ." Instead, FOE and CLEAN must establish that one or more of their members have suffered actual injury within the meaning of *Sierra Club v. Morton,* 405 U.S. 727, 734–35, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

## V

The testimony of plaintiffs' members does not establish that any of them has suffered an injury that is fairly traceable to the defendant's challenged conduct in this case. No evidence was presented concerning the chemical content of the waterways affected by the defendant's facility. No evidence of any increase in the salinity of the waterways, or any other negative change in the ecosystem of the waterway was presented. No evidence was presented that any plaintiff member has been adversely affected by the defendant's conduct. Plaintiffs' members who testified at trial attempted to establish the existence of injury in at least two ways. First, all of them testified in essence that their use and enjoyment of the waterways downstream from the defendant's facility is lessened to the extent that they "know" that the defendant has violated the requirements of its NPDES Permit by exceeding the permissible effluent limits. But these statements of knowledge do not constitute proof of injury. A member's knowledge that defendant has exceeded the effluent limits set by its NPDES Permit does not, standing alone, demonstrate injury or threat of injury. *Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron Inc.,* 123 F.3d 111 (3d Cir.1997). Generalized grievances shared by the public at large do not provide individual plaintiffs with standing. *See Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 475, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). It must be remembered that under its permit, the defendant is permitted to discharge certain pollutants into the Boggy Branch of Bull Swamp Creek.[12] The knowledge that a corporation has polluted waters is an "injury" suffered by the public generally. Nevertheless, absent a showing of actual, tangible injury to the waterways, plaintiffs' members are no less "concerned by standards" than any other citizen who takes an interest in the

---

12. DHEC issued the first NPDES Permit to defendant's predecessor in title, AT & T Nassau Metals Corporation, in 1984. The permit authorized the discharge of quantities of pollutants into the Boggy Branch of Bull Swamp Creek through Outfall 001, set discharge limitations and monitoring requirements for several pollutant parameters and required monitoring on a monthly basis and reporting the monitoring results on a quarterly basis. Defendant purchased the facility from AT & T Nassau Metals Corporation in September 1990. DHEC issued a renewal NPDES Permit to the defendant in February 1991 (effective March 1, 1991) which expired May 31, 1994. DHEC issued a new permit that was to become effective November 1, 1994 but which did not become effective until June 1997. The 1991 permit remained in effect until the date of renewal.

Defendant's 1991 permit also stated (Pl.Ex. 107, Part III, pp. 20–21, para. A(8)):

The limitation developed for Copper, Lead, Cadmium, Mercury and Polychlorinated Biphenyls, based on EPA Water Quality Criteria is

| Pollutant Parameter | Daily Maximum Discharge Limitation |
| --- | --- |
| Copper | 10 ug/l |
| Lead | 3.2 ug/l |
| Cadmium | 1.65 ug/l |
| Mercury | 0.024 ug/l |
| Polychlorinated Biphenyls | <0.014 ug/l |

However, the analytical detection level for these parameters are reflected in the limits pages. The permittee must analyze to the lowest detection limit of a South Carolina certified laboratory. If the analytical capabilities improve, the new detection level must be met or down to the above referenced water quality limitation.

The first phase of the 1994 permit which was to last until April 30, 1995, retained the Phase II limitations of the 1991 permit, except that it reduced the limitations for total suspended solids (hereafter "TSS"), cadmium, lead, and nickel and eliminated the limitations for mercury and PCB's. Pl.Ex. 400, Part I, p. 2, para. A(1). The second phase of the 1994 permit, which was to go into effect May 1, 1995, retained the first phase limitations, except that it tightened the iron limitation. *Id.,* Part I, p. 3, para. A(3). Until April 30, 1996, defendant was required only to monitor and report its toxicity tests but, as of May 1, 1996, was required to pass these tests. *Id.,* Part I, pp. 4–5, para. A(5); *see also Id.,* Part III, p. 19, para. 7(d). After a legal challenge to the permit by defendant, the permit became final on November 1, 1996, but the deadline for compliance with the toxicity limitation was extended by DHEC from April 30, 1996 to April 30, 1998.

environment. *Public Interest Research Group of New Jersey, Inc., et al v. Magnesium Elektron, Inc.,* 123 F.3d 111 (3d Cir. 1997).

One of plaintiffs' members, Mr. Shealy, has testified that he has reduced certain of his recreational activities in his 67 acre lake to some unspecified extent. But he and other members of his family continue to swim and fish in the lake. Indeed, he permits his grandchildren to swim each day. No evidence was presented that the water in Mr. Shealy's lake or other waters downstream from defendant's facility suffers from the pollution.

The plaintiffs also seek to establish the injury requirement by showing that the defendant's discharge violations pose a threat of injury to their members' recreational interests in the waterways downstream from the defendant's plant facility. In this regard, plaintiffs rely on language of the Clean Water Act in arguing that to pursue their claims against the defendant their members need only show that they "may be adversely affected by defendant's pollution." *See* 33 U.S.C. § 1365(f). But the phrase "may be adversely affected" is inherently limited by the injury prong of the constitutional test for standing. Plaintiffs' members must show some real, imminent threat of injury. This they have not done. When a plaintiff claims that a defendant's threatened injury is the source of his standing, he must show that the threatened injury is so imminent as to be "certainly impending." *Whitmore v. Arkansas,* 495 U.S. 149, 155–58, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990). The imminence requirement ensures that courts do not entertain suits based on speculative or hypothetical harms. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 564, 112 S.Ct. 2130 (1992).

Upon all the evidence, I find that none of the plaintiffs' members who testified have suffered any injury that is causally related to the challenged conduct of the defendant.

Because the evidence presented by plaintiffs fails to establish that any of their "members" have suffered any injury, I conclude that the plaintiffs do not have standing to proceed with this action.

## CONCLUSION

For the reasons above stated, the Court concludes that this case must be and it is hereby *DISMISSED* for lack of jurisdiction.

*IT IS SO ORDERED.*